QUINCE, C.J.,
dissenting.
I dissent from the majority decision because I find that the evidence presented at trial was legally insufficient to support the convictions. Accordingly, a judgment of acquittal should be entered.
Because the State’s case against Gosci-minski was solely predicated on circumstantial evidence, a special standard of review applies. Under this standard, a conviction cannot be sustained unless “the evidence is (1) ‘consistent with the defendant’s guilt’ and (2) ‘inconsistent with any reasonable hypothesis of innocence.’ ” Delgado v. State, 948 So.2d 681, 689-90 (Fla.2006) (quoting Orme v. State, 677 So.2d 258, 261 & n. 1 (Fla.1996)), cert. denied, — U.S. -, 127 S.Ct. 3016, 169 L.Ed.2d 738 (2007). However, “[e]vi-dence which furnishes nothing stronger than a suspicion, even though it would tend to justify the suspicion that the defendant committed the crime, ... is not sufficient to sustain [a] conviction.” Ballard v. State, 923 So.2d 475, 482 (Fla.2006) (quoting Davis v. State, 90 So.2d 629, 631-32 (Fla.1956)). In applying these legal standards, it is apparent from the evidence presented at trial that the State has failed to satisfy its burden of proving Gosciminski’s guilt beyond a reasonable doubt.
The State presented the testimony of Kyle Lee, a Nextel engineer, who testified concerning Gosciminski’s cell phone activity. He created a cell tower map, which indicated approximately what area Gosci-minski was in when he made phone calls during the morning of the murder. Gosci-minski’s cell phone records indicated that he had cell phone activity between 6:31 a.m. and 8:25 a.m. There was no activity on his phone from 8:37 a.m. until 9:12 a.m. At 9:12 a.m., Gosciminski received a call and according to the cell tower diagram, he was located in an area close to the Vala residence where Joan was murdered. The next two phone calls, one at 9:27 a.m. and the other at 9:28 a.m. also hit the cell tower close to the Vala residence.[8]
*1029 The next phone call, at 10:28 a.m., hit a cell tower close to the Harbor Federal bank in Palm City. The evidence also showed that on the morning of the murder, at 10:08 a.m., Gosciminski made a cash deposit of $430 at this bank. The next phone call was at 10:36 a.m., and it hit a cell tower that put Gosciminski somewhat near the area where Joan’s fanny pack was found. Evidence also showed that a $57 check made out to Gosciminski’s mother was deposited by Gosciminski at 11:04 a.m. at another Harbor Federal bank located at Darwin Square. The last two phone calls were at 11:29 a.m. and 11:39 a.m. These calls hit cell towers near Gosciminski’s residence. Gosciminski got to Lyford Cove shortly after lunch on that day. Upon arriving, he met with Debra Flynn, the executive director of the facility, and Nicole Rizzolo, the administrative assistant to Debra Flynn. Flynn testified that Gosci-minski came into Lyford Cove around 1:30 p.m. and that he appeared freshly cleaned with his hair slick and freshly combed. Rizzolo testified that she saw Gosciminski come in some time after lunch and that he looked like he had just showered.
The State also presented the testimony of Gosciminski’s ex-girlfriend, Debra Thomas. Debra testified that on the morning of the crime, Gosciminski left their home around 7 to 8 a.m. and came back home around lunchtime. She was not sure exactly what time he came home, but stated that it could have been sometime between 11 a.m. and 1 p.m. However, in her deposition, she stated that Gosciminski came home around 1 p.m. and left at 3 p.m. At trial she stated that she was not sure why she said that time. Debra further testified that Gosciminski was washing up at the sink and he had blood on the right side of his arm. She also noticed that Gosciminski had a pile of clothes on the floor and that they were soiled with blood. When questioned about the blood, Gosciminski stated that he had gone to collect some money for his friend Dominick in West Palm Beach and he had to “rough some guy up.” Debra also testified that about a week prior to the murder, she and Gosciminski took a drive on the beach on Hutchinson Island so Gosciminski could show her a house that would be on the market soon because he knew a resident at the assisted living facility who was not doing well. This house was identified as the Vala residence.
With regards to the two deposits that Gosciminski made on the morning of the crime, the State called employees from both banks to testify. However, it could not be determined from any of the witnesses’ testimonies if the two deposits were made inside the bank or at the drive-through window.[9] Also, with regard to the cash deposit of $430, Gosciminski testified that the cash was from the garage sale he and Debra Thomas had. Debra also testified that they were having a garage sale around the time of the murder.
The State’s case also consisted of information regarding the ring that Goscimin-ski gave Debra Thomas. Deborah Pelletier testified that at the beginning of August 2002 when Gosciminski came to the home owned by her and Ben Thomas,[10] Gosci- *1030 minski took notice of Pelletier’s rings and told her that her rings were nice and that he was looking to get Debra Thomas a two-carat diamond ring. In addition, Debra Thomas testified that three to four days prior to the murder, Gosciminski talked about a two-carat diamond ring that he was going down to West Palm Beach to get for her.
The State further presented testimony regarding a ring lineup conducted by Detective Hickox. A replica of Joan’s ring had been made by a jeweler based on the family’s description of what the ring looked like and photographs provided by Joan’s family. This ring was put in a lineup with five other rings, and witnesses who had seen the ring Gosciminski gave Debra Thomas were called in to identify which ring they saw. Debra Thomas picked out ring number three, which was the replica of Joan’s engagement ring. She stated that the only difference between ring number three and the one Gos-ciminski gave her was that the ring in the lineup looked new. With regard to the other witnesses who saw the ring, the witnesses that Gosciminski showed a ring to were unable to identify that ring in the lineup. The witnesses that Debra Thomas showed a ring to were able to pick out ring number three as the ring they saw. Gosci-minski picked out ring number four as the engagement ring he gave Debra. He said it was somewhat dark and had an antique look to it, which was the kind of jewelry Debra liked. He stated that he purchased the ring from Debra’s brother in late August.
The State also presented evidence concerning the location of the bag of jewelry that was identified as belonging to Joan, and the Geoffrey Beene cologne pouch that the jewelry was found in. The bag of jewelry was found by Deborah Pelletier’s father in the shed of her house on Import Drive. However, there was no testimony placing Gosciminski at that residence on or after the day of the crime. Deborah Pelle-tier testified that some time after Gosci-minski was arrested but before the jewelry was found, Ben Thomas came over to the house with some of his friends to remove his belongings from the house and garage.
The State also attempted to prove, through Debra Thomas’s testimony, that the Geoffrey Beene cologne pouch, which contained Joan’s missing jewelry, belonged to Gosciminski. Debra Thomas testified that when Detective Hickox called her to tell her that something was found in a small bag, she immediately described the bag to him as a small gray flannel bag that Gosciminski had in his top drawer, which came with Geoffrey Beene cologne that she had purchased for him. On the other hand, Deborah Pelletier testified that she was shocked when she saw that the jewelry was in a Geoffrey Beene cologne pouch because she remembered seeing a purchase made at a Geoffrey Beene store for $64 on a credit card statement for the Capitol One credit card used by both her and Ben Thomas. Deborah Pelletier, however, testified that she had never seen Ben Thomas with that cologne.
Even though the State attempted to prove Gosciminski’s guilt based on this evidence, the State did not have any physical or forensic evidence linking Goscimin-ski to the murder. All of the detectives and officers who were involved in the case testified that they were unable to find any relevant scientific or forensic evidence to link Gosciminski to the murder. None of *1031 the fingerprints found and tested matched Gosciminski. The bloody clothes that Debra Thomas allegedly saw on the afternoon of the crime were never found. The rugs on the bathroom floor where Debra saw Gosciminski washing off did not have any traces of blood. There were no eyewitnesses to the crime.
Dr. Charles Diggs, the medical examiner, testified that Joan had three different categories of wounds: bludgeoning, stabbing, and cutting. Dr. Diggs also testified that he could not exclude the possibility that more than one assailant was involved in the murder because multiple instruments were used. He also testified that with the massive amounts of blood on and around the body, it is likely that the assailant would have had a lot of blood on his or her person. He also testified that there was no evidence that Gosciminski caused these injuries to Joan.
The defense presented evidence to rebut the State’s case against Gosciminski, to demonstrate that other individuals could have committed this crime, and to support a reasonable hypothesis of innocence. First, Gosciminski testified to his whereabouts on the morning of the crime. His testimony of various locations he visited also placed him near the cell towers that his calls hit on that morning. He also testified that when Debra Thomas went with him to Lyford Cove to pick up a paycheck, Debra noticed Joan’s jewelry and commented on it. Gosciminski said that Debra Thomas was into antique jewelry, Debra Thomas knew the location of the Vala residence, and the three people she showed a ring to in Gosciminski’s absence were able to identify the replica of Joan’s ring in the lineup. The people that Gosci-minski showed a ring to were not able to identify the ring in the lineup. Ben Thomas had access to the shed where the victim’s jewelry was found because he had been at that house to collect some of his belongings after Gosciminski was arrested but before the jewelry was found. The jewelry was found after the police told Ben Thomas that they needed more evidence and that they did not have Joan’s jewelry. Although Deborah Pelletier said she never saw Ben Thomas wear Geoffrey Beene cologne, a credit card statement indicated he made a purchase at Geoffrey Beene in June 2002. Debra Thomas went to Ben Thomas’s house to discuss the murder after the detectives came to her house to ask about Joan’s murder and before they went to the police. Ben Thomas’s whereabouts on the morning of the crime were accounted for only until 8:45 a.m. and at 10:25 a.m. as evinced by his restaurant receipt and post office receipt. His whereabouts were not accounted for in between those times. Interestingly, the restaurant that Ben Thomas ate at and the dive shop he went to were on Seaway Drive, an area within the vicinity of the Vala residence.
It is also important to note that Deborah Pelletier implied that Ben Thomas wanted her and Gosciminski out of his life and Debra Thomas’s life.[11] Furthermore, Debra Thomas and Ben Thomas were married at the time of the trial, and Debra Thomas was one of the State’s key witnesses.
The discussion of the evidence outlined above leads me to conclude that while the evidence presented by the State was per *1032 haps sufficient to create some suspicion, it is simply not strong enough to support a conviction. Even with the evidence reviewed in the light most favorable to the State, a reasonable hypothesis of innocence cannot be excluded based on the evidence presented at trial to demonstrate that another perpetrator could have committed the crime. The State has failed to satisfy its burden of proving this case against Gosciminski beyond a reasonable doubt.
Accordingly, I would reverse the convictions and vacate the sentences, and remand with directions to enter a judgment of acquittal.

. With regard to the cell tower map indicating Gosciminski’s general locations based on which cell tower his calls hit, it is important to note the area of the outer limit of possibility in square miles. For example, Kyle Lee testified that for the cell tower on Hutchinson Island that Gosciminski's 9:12 a.m., 9:27 a.m., and 9:28 a.m. calls hit, Gosciminski could have been anywhere within a sixteen square mile area surrounding that tower. He stated that twelve miles encompassed the surrounding waters, thus Gosciminski could have still been four miles within the mainland and still hit the cell tower on Hutchinson Island where the Vala residence is located. *1029 In fact, in examining the cell tower map and miles scale, it seems that for each tower that Gosciminski's calls hit, the zones encompassing those towers were fairly large when measured in miles. Furthermore, the area that the map depicts is a densely populated area.

. This evidence is relevant because Debra Thomas testified that when Gosciminski was home, he had blood on his clothes and body.

. Prior to the murder, Michael Gosciminski was dating Debra Thomas and they were living together. Ben Thomas and Deborah Pel-letier were married for five years and lived together on Import Drive in Port St. Lucie. However, Debra Thomas and Ben Thomas started having an affair around July 2002. Around the last week of July 2002, Debra Thomas and Ben Thomas moved into the house of Ben Thomas and Deborah Pelletier. *1030 This lasted about one week, and then both parties moved out and Deborah Pelletier moved back in. At that point, Ben Thomas moved to another home by himself and Debra Thomas moved back in with Gosciminski. At the time of the trial, in April 2005, Ben Thomas and Debra Thomas had been married for close to two years.

. During the time of the murder, Ben Thomas and Deborah Pelletier were going through divorce proceedings and it was not amicable according to Deborah. Deborah testified that Ben Thomas filed a complaint with the police that she had stolen his credit card and was using it. Under these circumstances, some time in November 2002, Deborah Pelletier received a phone call from Ben Thomas and Ben stated that “it was the happiest day of his life, and it was going to be the best Christmas ever because [Deborah] was going to be joining Michael [Gosciminski] in jail.”