923 So.2d 475 (2006)
John Robert BALLARD, Appellant,
v.
STATE of Florida, Appellee.
No. SC03-1012.
Supreme Court of Florida.
February 23, 2006.
*476 James Marion Moorman, Public Defender and Paul C. Helm, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
John Robert Ballard challenges his two convictions for murder in the first-degree, his one conviction of robbery, and his sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Because we find the evidence presented at trial legally insufficient to support the convictions, we reverse, and direct that a judgment of acquittal be entered.

ISSUES ON APPEAL
On appeal, Ballard raises four issues: (1) The State did not prove the charges against him; (2) the trial court erred in finding that no discovery violation occurred when the State failed to disclose the fingerprint comparison chart prepared by the State's fingerprint expert for use as a demonstrative exhibit at trial; (3) the trial court violated the Eighth Amendment by finding that the defense failed to prove the mitigating circumstances of brain damage and Ballard's impaired capacity to conform his conduct to the requirements of the law; and (4) the Florida Death Penalty Statute is unconstitutional because it violates the Sixth Amendment right to have aggravating circumstances found by the jury. It is only necessary that we discuss the first issue because we find that the evidence presented is insufficient to support Ballard's convictions.

FACTS AND PROCEDURAL HISTORY
The charges against Ballard resulted from the beating deaths and robbery of Jennifer Jones and Willie Ray Patin, Jr., who were found dead in their duplex apartment in Collier County. Ballard, a neighbor and long-time friend of both Jones and Patin, was tried and found guilty of two counts of first-degree murder and one count of robbery after a jury trial. The jury recommended death by a vote of nine to three. The trial court sentenced Ballard to death for each of the murders and to fifteen years in prison for the robbery.

EVIDENCE
Ballard's claim as to the sufficiency of the evidence requires us to review the evidence presented at trial. The evidence presented at trial indicated that Jones and Patin lived in an apartment on 55th Terrace in Collier County. Ariana Harralambus, a friend of Jones, testified that on Saturday, March 6, 1999, she went to Jones and Patin's apartment to see Jones around 10 p.m. Harralambus testified that Jones, Patin, Ballard, Robert Daily, Mike Howell, and a man named Louis were present. Daily testified that he was not sure whether Ballard was in the apartment on Saturday night, but Daily thought Ballard *477 was in the apartment on Friday night, March 5. Jones and Patin were planning to move to Texas that following Monday, March 8, because Patin had a job lined up with his father.
The week prior to Jones' and Patin's deaths, Francisco Garcia, who was affiliated with a street gang, shot through Jones and Patin's windows with two other men. It was well known that Jones sold marijuana, and the transactions usually occurred in her bedroom. Harralambus testified that she observed that Jones had over a thousand dollars in the apartment on Saturday night. Jones usually kept the money in several locations, including her purse, under her waterbed mattress, and in a shoe box in her closet. Harralambus testified that when she left around midnight on Saturday night, only Daily, Jones, and Patin remained in the apartment. Harralambus was not sure what time Ballard left the apartment on Saturday night.
Harralambus and Daily made plans with Jones to go out on Jones' boat on Sunday morning around 11 a.m. Harralambus and Daily both tried to contact Jones on Sunday morning without success. Harralambus went to Jones and Patin's apartment, but Jones' car was not there. Harralambus then went to a shopping center and tried to contact Jones again. Harralambus returned to the apartment and left a folded note above the door asking Jones to page her. Jones never contacted Harralambus. Daily also went to the apartment but Jones' car, a red Mazda hatchback, was gone. Daily was unable to contact Jones on Sunday.
Around 9 a.m. on Monday, March 8, Corporal Todd Sanner of the Collier County Sheriff's Office responded to a call about an abandoned vehicle and found Jones' car in the woods at the back of a vacant lot on Painted Leaf Lane. The car had not been reported as stolen, and it did not appear that anyone had tampered with the ignition. Officers who processed the car later found blood and fingerprints. None of the prints were identified as being Ballard's. The blood was later identified as belonging to Patin. Corporal Sanner drove by Jones and Patin's apartment but did not notice anything out of the ordinary. Ballard had lived on Painted Leaf Lane with his father-in-law for a few months in 1994. However, Ballard's father-in-law moved in 1996. This vacant lot was approximately a mile from Ballard's current residence.
On Monday, March 8, Harralambus tried to contact Jones again before going to work. Daily also tried to contact Jones on Monday without success. Daily testified that he went to Jones and Patin's apartment and tried to enter on Monday afternoon but the door was locked. Daily was normally in regular contact with Patin and was concerned because he was unable to contact Patin all weekend. Daily looked up Jones' father's phone number and contacted him on Monday afternoon.
Daily met Jones' father in front of Jones and Patin's apartment. They went around the back of the apartment and popped out the sliding glass door to gain entry. Upon entering, they noticed boxes and called out for Jones. They found Jones' body in the master bedroom and Patin's body in the spare bedroom. Daily tried to locate the house phone to call the police but could not find it, so he left the apartment to use a neighbor's cell phone to call the police. Daily testified that he did not touch anything, except maybe a wall, while he was inside the apartment. Jones' father testified that he did not touch Patin but that he did grab Jones' arm. He left the apartment through the front door but could not remember if it was unlocked.
Collier County Sheriff's Deputies and emergency medical personnel responded to *478 the call around 4:46 p.m. Upon arrival at the apartment, police found Jones' body on the floor of the master bedroom and Patin's body on the floor of the spare bedroom. Lieutenant Mike Wittenberg was the patrol supervisor on duty when the Collier County Sheriff's office responded. Lieutenant Wittenberg testified that he came in through the front door and, after noticing the bodies, was careful not to disturb anything in the apartment. Lieutenant Wittenberg restricted access to the apartment and only permitted an EMS supervisor to enter and verify that Jones and Patin were deceased. The EMS supervisor used an EKG strip to check for signs of life; there were none. Lieutenant Wittenberg testified that other than placing the EKG strips on Jones and Patin, the EMS supervisor did not touch the victims' bodies.
Corporal Raymond Erickson of the Collier County Sheriff's Office Crime Scene Investigation Bureau testified that when he arrived at the crime scene, there was no one present in the apartment except the bodies of the victims. Corporal Erickson testified that the apartment was a two bedroom duplex and that it appeared as if the residents had been packing to move with boxes. From the hallway, Corporal Erickson could see Jones in the master bedroom and Patin in the other bedroom, both on their backs. Corporal Erickson pulled fingerprints that had already been dusted in several areas of the apartment. He lifted four fingerprints from the waterbed frame near Jones' upper torso, from her shoulder area to her waist area.
Lieutenant Michael Gawlinski, another member of the Collier County Sheriff's Office Crime Scene Investigation Bureau who is also an expert in blood spatter analysis, assisted Corporal Erickson at the scene. Lieutenant Gawlinski indicated that the blood spatter on Jones' body and the limited amount of blood spatter in the master bedroom, except in the vicinity of Jones' body, indicated that Jones was not standing very long after being attacked. The extensive blood spatter in the bathroom, hallway, and spare bedroom indicated that Patin was initially attacked in the bathroom, then crawled down the hall and around the spare bedroom until he collapsed near the closet. Lieutenant Gawlinski also took photographs of the crime scene. A barbell and curl bar, both with a bloody fingerprint each, were found in the spare bedroom. Swabbings of suspected blood were taken from the barbell. Scrapings of suspected blood were taken from the curl bar and a lamp in the spare bedroom. None of the fingerprints on the barbell and curl bar were identified as Ballard's. Some hair was found on a pair of plaid shorts by the curl bar. The dresser drawers in the spare bedroom had been opened, and a black purse was found in the hallway, knocked or dumped over. The investigators were unable to determine how the apartment had been entered and what weapon was used to commit the murders.
Corporal Erickson also assisted in bagging evidence collected by the medical examiner, Dr. Manfred Borges. Dr. Borges viewed the bodies at the scene and performed the autopsies. He found multiple hairs in Jones' right hand under a torn piece of a plastic bag that was stuck underneath Jones' hand, but could not say how the hairs got in Jones' hand. He conducted a rape kit examination; it was negative. Dr. Borges found multiple hairs in Patin's left hand, but could not say how the hairs got there. Dr. Borges also collected samples of Jones' and Patin's head hair, nail scrapings, and clippings, and also blood samples from both victims for DNA testing.
*479 Dr. Borges determined that Jones, who was five feet, six inches tall and weighed eighty-eight pounds, died as the result of blunt force trauma to her head, which shattered her skull. Dr. Borges testified that Jones was struck in the head at least three times, and her death would have been quick but not instantaneous. Jones also suffered defensive injuries. Her left thumb was broken and there were abrasions on the fingers of her left hand.
Dr. Borges determined that Patin, who was five feet, seven inches tall and weighed ninety-four pounds, also died as the result of blunt force trauma to his head, which shattered his skull. He stated that Patin's death would have also been quick, within seconds or minutes, but it would not have been instantaneous. Patin also suffered defensive injuries. The fingernail of his left middle finger was sheared off; the skin behind it was bruised and damaged. Dr. Borges examined a weight found in the apartment that was consistent with producing the blunt force trauma, but he would not say with certainty that the weight was used to kill Jones and Patin. However, Dr. Borges did testify that the object that caused Jones' and Patin's fatal injuries was hard and dense.
Deputy Joseph Barber, a fingerprint examiner for the Collier County Sheriff's Office, received 118 latent print cards to examine in relation to the crime scene. Deputy Barber found that forty-six of the prints were suitable for comparison, but could only identify ten of the forty-six prints. Six belonged to Patin, three to Jones, and one to someone named Freeman. The Freeman print was found on a CD in Jones' car. Of the four prints found on the frame of the waterbed, two were smudges not suitable for identification. Two more, Q37 and Q50, had some ridge detail but Deputy Barber could not identify them. Another Collier County Sheriff's Office fingerprint expert reviewed Deputy Barber's work in this case and agreed with his conclusions. Deputy Barber then sent 105 unidentified prints to the Florida Department of Law Enforcement (FDLE) for examination.
Analyst Phillip S. Balunan, an FDLE crime laboratory analyst, examined the 105 unidentified prints and was able to identify three of them. Balunan photographed the latent prints and used the photographs to make the identifications. He testified that photographs of latent prints can be enhanced by making the photographs lighter or darker or by changing the contrast. Balunan identified Q50, one of the fingerprints on the waterbed frame, as the fingerprint of Ballard. Balunan's identification was subject to peer review and confirmed by Senior Analyst Steven P. Casper, another fingerprint analyst at FDLE. Importantly, Balunan also testified that it is impossible to scientifically determine the age of a fingerprint or how long it has been in place.
John Kilbourn, a forensic scientist for a private laboratory, examined six hairs that were found in Jones' right hand. Kilbourn compared the samples to Jones' head hair and determined that three hairs were consistent with her head hairs. Two hairs were too short to make any conclusion. The remaining hair, which had been cut in two and placed in two separate test tubes, was consistent with the arm hair of Ballard.
Kilbourn explained the three stages of hair growth: (1) the anagen phase, during which the hair is growing for two to eight years; (2) the catagen phase, lasting for a few weeks, during which growth discontinues; and (3) the telogen phase, during which the bulb of the root reduces in size for two to four months until the hair falls out from washing, brushing, or blowing wind as a naturally shed hair. A hair in *480 the telogen phase is loosely held and can be forcibly removed with normal daily activity. In the late telogen phase, very little force is required to remove the hair. A hair in the late telogen phase has no viable cellular material attached to the root that can be tested for DNA. Hairs in the anagen, catagen, and early telogen phases have some viable cellular material attached to the root that can be tested for DNA. It is hard to tell the difference between hair in the late catagen and early telogen phase. Kilbourn determined that the hair consistent with Ballard's arm hair was in the telogen phase. However, there was no cellular tissue left on the hair, so Kilbourn could not determine whether the hair was forcibly removed or naturally shed. Patin had 114 hairs or fibers on his hands, while Jones only had six hairs in her hand.
Kilbourn examined hundreds of hairs in this case. He identified some of them as those of Jones and some as those of Patin. Some hairs were very short hairs, body hairs, or hair fragments that did not allow an inference to be made on identification. Kilbourn testified that there were five forcibly removed hairs found in the apartment that he could not identify. One of the unidentified hairs was found in a stained area around the barbell. Another unidentified hair was found on a striped shirt. Two came from the spare bedroom door. Another came from Patin's hand. Kilbourn agreed that it is possible for hair to be transferred from one surface to another, such as from carpeting to someone's hand. Kilbourn also found some seventy hairs in Jones' car and testified that forty-seven of them were unidentified. None of the hairs found in Jones' car were microscopically consistent with the known arm hair of Ballard.
Roger Morrison, a lab director and DNA analyst for the Alabama Department of Forensic Science, who is also engaged in private practice with Kilbourn, testified that DNA testing is possible on a hair with a telogen root if it has a follicular tag (soft tissue associated with the root of the hair). If there is no soft tissue, then DNA results cannot be obtained. When there is soft tissue associated with the root of the hair, some force has to be used to remove the hair from the follicle.
Patricia Bencivegna, an FDLE Laboratory Analyst in the serology and DNA section, testified that she examined hair from the right hand of Jones and determined that it was suitable for DNA testing. DNA tests of the hair revealed a mixture of profiles. Patin was excluded as a possible source but Jones was included as a minor component to the DNA mixture. Ballard was included as a possible source of the mixture. Bencivegna requested Stable DNA Replication (SDR) analysis for a higher degree of discrimination. The other hairs from Jones' right hand were not suitable for analysis. Bencivegna found DNA profiles consistent with Patin and usually excluding Jones from blood stains found on numerous items including: bath towels from the bathroom, carpet from the spare bedroom, a white sock, toilet paper, a ten-pound weight, a blue blow-up chair, the bathroom door frame, a barbell, a curl bar, a lamp from the spare bedroom, the shower curtain, scrapings from the toilet, scrapings from the bathroom floor, a seat cover, and a fingernail polish bottle from Jones' purse.
Melissa Suddeth, an FDLE Crime Laboratory Analyst Supervisor, testified that she performed Short Tandem Repeat (STR) analysis of the hair from Jones' right hand and found that it matched Ballard's DNA profile. Suddeth testified that approximately one in every 11.8 quadrillion African-Americans, 750 trillion Caucasions, *481 and 2.5 trillion Southeastern Hispanic individuals would have a DNA profile that matched Ballard's.
Ballard called several witnesses during his case. Ray Anthony Wickenhouser, a lab director for a forensic lab in New Iberia, Louisiana, testified that it is possible to get a full DNA profile from a telogen phase hair with a follicular tag. Wickenhouser said that his lab routinely gets full DNA profiles from hairs that have fallen out naturally and from hair that was forcibly removed. Wickenhouser testified that there was no way to tell the amount of force used to remove a hair just by looking at the hair. He stated that grabbing one's arm might provide sufficient force to remove a telogen hair.
Lieutenant Gawlinski testified that he examined Ballard's vehicle several months after the murders and did not find any blood. Ballard consented to the investigation.
Collier County Sheriff's Office Deputy Shawn Arthur testified that he responded to a drive-by shooting at Jones and Patin's apartment prior to the murders. Ballard was a witness to the drive-by shooting and described and identified the vehicle involved in the incident. Lori Schoffield, who worked for the Collier County Sheriff's Office on road patrol, stated that the vehicle was subsequently stopped and, among the five people in the vehicle, only Francisco Garcia was arrested for the shooting. Collier County Sheriff's Deputy Timothy Guerrette testified that at the time of the drive-by shooting, two of the individuals involved, Garcia and Donald Tafoya, were members of a street gang, and that Tafoya was arrested for driving without a license after the shooting.
Jodi Lee Crossman, Ballard's neighbor, testified that on the Sunday of the weekend of the murders, Ballard and his family came over for a barbecue. Crossman did not notice anything unusual about Ballard's behavior.
Robert King testified that he lived in the Southwest Golden Gate area on Painted Leaf Lane in March of 1999. King testified that he walks his dogs twice a day on a regular basis in the mornings and evenings. On the evening of Sunday, March 7, 1999, King walked his dogs past the vacant lot where Jones' car was found on Monday morning. King described the lot as a place where "a lot of people liked to party." He testified that he did not see a car on Sunday evening, but could not "say one way or the other whether the car was there on Sunday or not." The next morning, King was at the empty lot and noticed a car pulled up in the bushes. He testified that he could not have seen the car from the road. King had previously stacked up some rocks and sticks to keep people from going onto the lot. The rocks and sticks had not been disturbed when King walked by on Sunday, but on Monday, King noticed that someone had moved them.
The State called one rebuttal witness. Deputy Barber testified that he compared thirty-eight of the unknown fingerprints from the crime scene and Jones' car to the prints of known gang member Donald Tafoya, the driver of the car involved in the shooting of Jones and Patin's apartment. Tafoya's prints did not match any of the unknown fingerprints.
At the conclusion of the State's presentation of evidence, Ballard moved for a judgment of acquittal, contending that there was a reasonable hypothesis of innocence in that the only evidence that linked Ballard to the case is equally consistent with the fact that he was often a guest in Jones and Patin's apartment. The trial court denied this motion, and Ballard renewed the motion at the close of all the evidence. The trial court again denied the *482 motion. Because we find the evidence insufficient to sustain the convictions, we conclude that the trial court erred.

INSUFFICIENCY OF THE EVIDENCE
In capital cases, this Court has recognized that it has a fundamental obligation to ascertain whether the State has presented sufficient evidence to support a conviction. Ballard contends that although the State proved that Jones and Patin were robbed and killed, and one of his hairs and fingerprints was in the apartment, the State failed to prove that Ballard was the perpetrator of those crimes.
Preliminarily, we note that this is a case based upon purely circumstantial evidence. In Davis v. State, 90 So.2d 629 (Fla.1956), this Court explained:
Evidence which furnishes nothing stronger than a suspicion, even though it would tend to justify the suspicion that the defendant committed the crime, it is not sufficient to sustain conviction. It is the actual exclusion of the hypothesis of innocence which clothes circumstantial evidence with the force of proof sufficient to convict. Circumstantial evidence which leaves uncertain several hypotheses, any one of which may be sound and some of which may be entirely consistent with innocence, is not adequate to sustain a verdict of guilt. Even though the circumstantial evidence is sufficient to suggest a probability of guilt, it is not thereby adequate to support a conviction if it is likewise consistent with a reasonable hypothesis of innocence.
Id. at 631-32. Similarly, in Miller v. State, 770 So.2d 1144 (Fla.2000), we held that "the circumstantial evidence test guards against basing a conviction on impermissibly stacked inferences." Id. at 1149. Suspicions alone cannot satisfy the State's burden of proving guilt beyond a reasonable doubt, and the expansive inferences required to justify the verdict in this case are indeed improper. "Although the jury is the trier of fact, a conviction of guilt must be reversed on appeal if it is not supported by competent, substantial evidence." Crain v. State, 894 So.2d 59, 71 (Fla.2004) (citing Long v. State, 689 So.2d 1055, 1058 (Fla.1997)). "In cases in which the evidence of guilt is wholly circumstantial, it is the trial judge's task to review the evidence in the light most favorable to the State to determine the presence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences." Id. (citing State v. Law, 559 So.2d 187, 189 (Fla.1989)). Evidence is deemed insufficient if "the prosecution has failed to prove the defendant's guilt beyond a reasonable doubt." Id. (quoting Tibbs v. State, 397 So.2d 1120, 1123 (Fla. 1981), aff'd, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982)).
In Cox v. State, 555 So.2d 352 (Fla. 1989), we held that "one accused of a crime is presumed innocent until proved guilty beyond and to the exclusion of a reasonable doubt. It is the responsibility of the State to carry this burden." Id. at 353 (quoting Davis, 90 So.2d at 631). If the State's evidence is not inconsistent with the defendant's hypothesis of innocence, then no jury could return a verdict in favor of the State. State v. Law, 559 So.2d 187, 189 (Fla.1989). In Cox, investigators found a hair, some O-type blood, and a boot print, none of which was definitely the defendant's, in the victim's car. 555 So.2d at 353. "These items, along with bitemark testimony and [the defendant's] presence in the area, comprised the state's circumstantial evidence." Id. A hair comparison expert had testified that the hair found in the car was consistent with the defendant's hair, but this Court stated that *483 "hair analysis and comparison are not absolutely certain and reliable." Id. The defendant did have O-type blood, and the boot print appeared to have been made by a military-type boot similar to boots the defendant owned, but the "boots were not compared with the boot print." Id. The defendant also had part of his tongue bitten off, and a surgical assistant testified that it was consistent with someone other than the defendant biting it. Id. This Court stated, "Although state witnesses cast doubt on Cox' alibi, the state's evidence could have created only a suspicion, rather than proving beyond a reasonable doubt, that Cox, and only Cox, murdered the victim." Id.
We find that the present case is similar to Cox in that the State's evidence, while perhaps sufficient to create some suspicion, is simply not strong enough to support a conviction. See also Jaramillo v. State, 417 So.2d 257 (Fla.1982) (finding insufficient evidence to support a murder conviction when the defendant's fingerprints were found at the murder scene but the State could not prove that the prints were left at the time of the murder and was unable to refute the defendant's hypothesis that he had left the prints earlier when helping the victim's nephew straighten the garage).

THIS CASE
When we apply the legal standards discussed above to this case, it is apparent that the State has failed to satisfy its burden of proof. When reduced to its essence, the entire circumstantial case presented against Ballard consists of two items: (1) Ballard's fingerprint located on the frame of the waterbed in the master bedroom near Jones' body, with no evidence presented as to when or how the fingerprint was left; and (2) one hair found on Jones' hand consistent with Ballard's arm hair in the telogen phase, with no evidence to ascertain if the hair was pulled out prematurely or naturally shed, and with that hair being only one out of six total arm hairs found in Jones' hand and among hundreds of hairs found at the crime scene. We conclude that whether considered together or individually, this evidence is insufficient to prove that John Robert Ballard robbed and killed Jennifer Jones and William Ray Patin, Jr.
It was, of course, the trial court's duty to determine whether the State met its threshold burden to present substantial, competent evidence to refute Ballard's theory of innocence. Johnston v. State, 863 So.2d 271, 283 (Fla.2003) (citing Darling v. State, 808 So.2d 145, 155 (Fla. 2002)). Ballard's hypothesis of innocence at trial was that he was not guilty, and that another individual, including perhaps a member of the gang that had shot into Jones and Patin's apartment a week prior to the murders, or some other unknown assailant, committed the murders. He further contends that any evidence of his presence in the apartment, such as a hair or fingerprint, is equally as susceptible to an inference that it was left there during one of his numerous innocent visits to the premises as it would be to an inference that it was placed there while he was committing the charged crimes. He similarly notes the countless other hairs and fingerprints in the premises and in Jones' car that were not traced to him and could have belonged to the unknown perpetrator.
While the State concedes that the only evidence linking Ballard to the murders is a fingerprint on the waterbed frame and a hair in Jones' hand, it is not disputed that the State presented no direct evidence of when the hair and fingerprint were left or how they came to be left in their locations. Further, there were no photographs admitted *484 into evidence even to show the exact orientation of the fingerprint or its location on the waterbed frame. Indeed, the State's witnesses testified that Ballard was a frequent visitor to the victims' apartment, and the State presented no evidence to prove that he had never been in the bedroom before. In fact, no questions about any access limitations during Ballard's frequent visits were posed to the State's witnesses, including other friends of the victims who knew Ballard to be in the same social circle. Moreover, there was evidence that Jones was a marijuana dealer and conducted numerous transactions with a variety of persons in her bedroom. The State presented no evidence to establish that Ballard had never taken part in any of these transactions. Given the evidence of Ballard's frequent and personal access to the premises, the State simply did not refute the possibility of his prior innocent presence in the bedroom as accounting for the hair and print. The fingerprint and hair evidence only serves to prove that Ballard was in Jones and Patin's apartment at some point in time, which Ballard readily admits because he was a long-time friend of the couple and socialized regularly with them.
At trial, experts also offered conflicting testimony as to whether the fingerprint was an actual match to Ballard's. However, even if the print is assumed to be Ballard's, this does not prove that it was left at the time of the murders. Balunin testified that it is impossible to scientifically determine the age of a fingerprint or how long it has been in place. Also, if the State's theory of the case is to be believed, and Ballard left the print when he was killing Jones, it leads one to wonder why the fingerprint was not bloody when the murder scene undoubtedly was. Further, it is undisputed that Jones' fingernails did not possess Ballard's DNA even though the State suggests that there had been a struggle between Jones and her assailant. These are just two of many unanswered questions remaining after a consideration of the State's evidence.
According to the expert testimony, Ballard's hair in Jones' hand was in the late telogen phase, and therefore could have fallen out under a great variety of innocent circumstances, including falling out in some other area of the premises and migrating to the bedroom along with countless other hairs and minor debris found at the scene. Definitive evidence to show that the hair fell out during the attack on Jones is lacking. It is just as likely that it fell out any time Ballard was casually in the room, or it could have been transferred to the room from any other part of the apartment which Ballard was known to frequent. Further, while there was one hair identified as Ballard's from Jones' hand, there were other hairs not traced to Ballard on the hand, and literally hundreds of other unidentified hairs at the scene that were never DNA-tested.
Importantly, there were no eyewitnesses to the crime, its preparation, its execution, or its aftermath. Further, despite evidence of Ballard's cooperation, there was never a search of Ballard's home. There were no admissions by Ballard, and no one testified as to any suspicious conduct on his part. In fact, the evidence indicated that he went to a neighbor's barbecue the next day with his family. The State's alleged motive for the crime was robbery; however, this is a generic motive that could be applied to any perpetrator and not specifically to Ballard. There is no evidence that Ballard had any interest in robbing the victims, and there was no evidence presented of Ballard spending the money allegedly stolen. None of Ballard's fingerprints were found on items dumped from Jones' purse, which the State alleged provided strong evidence of a robbery. *485 Further, the record does not reflect samples being taken from other guests at the social gathering the night before the homicides, or these guests being investigated at all, even though many of them provided testimony during the State's case. The murder weapon was never discovered, and, although the curl bar and weight found at the scene had bloody fingerprints, none of them were identified as Ballard's. The State presented no evidence of Ballard having any hatred or ill feelings towards the victims; in fact, there was evidence that a week before the murders, he had helped the authorities identify the individuals who shot into the victims' apartment.
Finally, although the State took custody of Jones' abandoned car, there was no evidence presented to connect Ballard to the car. The State speculated at trial that because it was established that Ballard's residence for a few months many years before, in 1994, was in the neighborhood where the vacant lot was located, and that his current residence was only slightly over a mile away from the lot, there was evidence linking him to the car and tending to establish that he committed the murders. However, we agree with Ballard that this assertion constitutes pure speculation, unsupported by any actual evidence. Testimony at trial established that this vacant lot served as the location for activities involving numerous individuals. There was blood found in the car, but it was Patin's and not Ballard's. Further, fingerprints were found in the car but were not matched to Ballard. In addition, the finding of the fingerprint from someone named Freeman on a CD in the car was never fully explained at trial. Neither was there an explanation for the unidentified fingerprint on the inside driver's door handle of the car.
There were also some seventy hairs found in Jones' car, and none of them were consistent with Ballard's profile. Also, the only evidence regarding the time the car appeared in the lot came from a nearby resident who noticed Jones' car parked in the abandoned lot. The State provided no evidence to contradict or explain why this witness did not see the car on the Sunday (the day Ballard was at a neighbor's bar-becue) after the murders but saw it on Monday morning. If anything, the absence of evidence from the car related to Ballard further supports his claim since it would seem apparent that the perpetrator of the crimes was responsible for the movement of the car.
As noted above, there was evidence presented by the defense at trial concerning a drug-related gang shooting into Jones and Patin's apartment a week prior to the murders. However, despite having full knowledge of this event, the State did not present definitive evidence ruling out members of the gang as the perpetrators of the murders. The State asserted at trial that none of the fingerprints at the crime scene or in Jones' car matched Donald Tafoya (the driver of the car during the shoot-out), but the defense established that the gang has approximately eighty members total; none of these other members were ruled out by the State's presentation of evidence regarding its investigation of the murders. Whether a member of this gang or someone else committed these terrible crimes is simply not known.

CONCLUSION
When the State has presented sufficient evidence to establish the guilt of one accused of a serious crime, it is the responsibility of the courts to acknowledge that evidence. However, it is equally the duty of the courts to ensure that the State is held to its burden of proof when someone is charged with a serious crime and liberty and life are at risk. As our case law set *486 out above establishes, because this case is purely circumstantial, we must determine whether competent evidence is present to support an inference of guilt "to the exclusion of all other inferences." Crain, 894 So.2d at 71 (citing State v. Law, 559 So.2d 187, 189 (Fla.1989)). Our discussion of the evidence outlined above leads us to conclude that the State has not met this standard and has not performed its duty to prove this case against John Robert Ballard beyond a reasonable doubt.
Accordingly, upon review we conclude that the evidence is insufficient to support the convictions, and we reverse the convictions and vacate the sentences, and remand with directions that a judgment of acquittal be entered.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.