BLACK, Judge.
Abel Miranda appeals his convictions and sentences for second-degree murder with a firearm and burglary with assault. He raises three issues. Because the State failed to present sufficient evidence upon which the jury could convict Miranda, the trial court reversibly erred in denying Miranda’s motion for judgment of acquittal. We therefore reverse Miranda’s convictions and remand for entry of a judgment acquitting Miranda of the charged crimes. We do not reach the remaining issues raised on appeal.
I. Facts
In the early morning hours of November 30, 2007, Pedro Delio Treto-Garcia was murdered in his home in Punta Gorda, Florida. The house is in a rural area on a large tract of land and sits back from the road. The property has a gate for entry from and exit to the road. Although there are neighboring homes, they are located *53 100 to 300 feet from the victim’s home. The victim shared his home with his girlfriend, Adis Samara Molina Armas (Ms. Molina). Ms. Molina was in the home the morning of November 30 and witnessed the victim’s death.
The basic facts, as testified to by Ms. Molina, are undisputed. On the night of November 29, 2007, Ms. Molina and the victim went to sleep on the second-floor balcony, as they had done on prior occasions. Sometime around 4 a.m., Ms. Molina left the balcony to sleep in the adjoining master bedroom. Minutes later Ms. Molina heard a loud noise coming from the first floor of the house and a man, whom she described as young, white, around 5'6" tall, and chubby, appeared at the master bedroom doorway. It was dark in the room and Ms. Molina covered herself with a comforter, but she was able to see the man’s face and that he had a firearm. The man spoke in Spanish and said, “I’m going to kill your woman. I’m going to shoot your woman.” Ms. Molina testified that the man’s choice of words and dialect led her to believe he was Cuban. The man then approached the balcony and shots were fired.
Following the shots, two more men came upstairs. They were young, around 5'6" tall, and thin. Ms. Molina noticed no distinguishing characteristics on any of the men. The intruders then forcibly removed the victim from the balcony and kicked him down the stairs. Shortly thereafter, the men left the home. Ms. Molina, having gotten out of bed, looked through the master bedroom window and saw three men running toward the front gate. She then went downstairs, saw that the victim was alive, attempted to call 911, and upon realizing her cell phone was not charged, ran to the nearest neighbor’s home.[1] Despite receiving cardiopulmonary resuscitation (CPR),[2] by the time police and paramedics arrived at the home, around 5:30 a.m., the victim was dead.
In addition to detailing the events of the night the victim was murdered, Ms. Molina testified that a camouflage shirt belonging to the victim had been in the house the night of the murder.[3] She also confirmed that a camouflage shirt was found by the gate to the property the next morning. Although she knew the victim’s shirt was not unique, she believed the shirt found by the gate to be the same shirt that had been in the house the night of the victim’s murder.
Ms. Molina also testified that she had been shown a photographic lineup of suspects containing Miranda’s photograph but that she had not identified Miranda as one of the three intruders.[4] She was then asked — with Miranda standing in front of her — whether he looked like one of the intruders. She responded that he did not. Finally, Ms. Molina testified that although she initially told officers that the victim did *54 not have a gun, she had later admitted that he did and that she had hidden it after the shooting.
In addition to Ms. Molina’s testimony, the State presented testimony from one of the victim’s neighbors, a responding paramedic, responding officers, and a crime scene technician and a crime lab analyst, both employed by the Florida Department of Law Enforcement (FDLE), among others. The victim’s neighbor testified to the aftermath of the shooting, his attempts at CPR, and to Ms. Molina’s overall demean- or before and after officers arrived on scene. He described Ms. Molina’s behavior before officers arrived on the scene as “nonchalant,” stating that she sat on the sofa and folded clothes. However, when officers arrived, he described her demean- or as “hysterical” and testified that her behavior changed depending on the proximity of officers, becoming increasingly hysterical when officers were near her. Ms. Molina explained her nonchalant behavior during the time that her neighbors were administering CPR to the victim by stating, “I was taking a break.”
The remaining witnesses established the cause of the victim’s death, the location of his death, the locations of blood and blood spatter, the locations of a camouflage shirt and bolt cutters, the presence of blood on the shirt and bolt cutters, and the number of DNA profiles found at the scene.
Over objection, the State was permitted to introduce evidence of a marijuana grow house located on the victim’s property. The grow house contained approximately forty pounds of marijuana, worth between $150,000 and $240,000. Aside from being located on the victim’s property, the State presented no evidence linking the victim to the marijuana. However, the State argued that the value of the marijuana provided motive. The State’s evidence also did not connect Miranda to the grow house.
The FDLE crime lab analyst discussed, in detail, how she tested for DNA on both the camouflage shirt and bolt cutters after areas on both items tested presumptively positive for blood. Specifically, the inside collar and inside lower back areas of the shirt were tested. Both areas contained Miranda’s blood-DNA. The tested areas did not reveal DNA from the victim. The bolt cutters — found approximately a mile and a half from the scene — were not sent to FDLE for testing. However, a swab taken from the bolt cutters was tested and returned a positive match for Miranda’s DNA. According to the FDLE witnesses, there was no way to determine how old the blood on the bolt cutters was or how the blood was transferred to them.
The FDLE analyst also testified to the absence of Miranda’s DNA on the gate and in the house, despite the presence of other, unidentified DNA samples. The State’s witnesses established that multiple blood samples were sent to FDLE for DNA testing; of those, only two contained blood identified as Miranda’s. Miranda was not linked to the bloody footprints found in the house or to the fingerprints on the door showing forced entry.
II. Issue
The determinative issue on appeal is whether the trial court erred in denying Miranda’s motion for judgment of acquittal, predicated on the argument that the State’s evidence failed to prove that Miranda committed murder and burglary with assault. To convict Miranda of second-degree murder with a firearm the State had to establish that (1) the victim is dead; (2) the victim’s death was caused by Miranda’s criminal action; (3) the death was an unlawful killing accompanied by an act imminently dangerous to another and *55 demonstrating a depraved mind without regard for human life; and (4) Miranda carried, displayed, used, threatened to use, or attempted to use a firearm. See §§ 775.087(1), 782.04(2), Fla. Stat. (2007); Fla. Std. Jury Instr. (Crim.) 7.4.[5] To convict him of burglary with assault, the State was required to establish that (1) Miranda unlawfully entered the victim’s home; (2) at the time he did so, Miranda intended to commit an offense therein; and (3) Miranda assaulted the victim or Ms. Molina. See § 810.02(1), Fla. Stat. (2007); Fla. Std. Jury Instr. (Crim.) 13.1; Joseph v. State, 965 So.2d 357, 358 (Fla. 4th DCA 2007). The crux of Miranda’s motion for judgment of acquittal below and his argument on appeal is that the State failed to establish the essential element of identity in each crime — that it was Miranda who caused the victim’s death and that it was Miranda who entered the victim’s home.[6]
Miranda contends that the State’s ease was purely circumstantial. Conversely, the State argues it had direct evidence to support its case. While the State is correct that it presented some direct evidence, that evidence does not address the crucial element of identity. Ms. Molina provided direct evidence of the circumstances of the victim’s death, and the evidence of Miranda’s DNA directly connected Miranda to the camouflage shirt and bolt cutters; however, Ms. Molina did not identify Miranda as one of the three men who entered her home and killed the victim and the DNA evidence did not place Miranda at the scene of the murder at the time the victim was killed. See Burkell v. State, 992 So.2d 848, 854 (Fla. 4th DCA 2008) (Farmer, J., dissenting) (“Footprints and blood-DNA may operate as direct evidence for some specific issues.... But here the State relied on these two kinds of evidence to prove something beyond mere presence or identity. The State asked the jury to infer from the footprints and blood-DNA evidence that it was the father who had committed the premeditated murder.”). Circumstantial evidence has been defined as “proof of certain facts and circumstances from which the trier of fact may infer that the ultimate facts in dispute existed or did not exist. The conclusion as to the ultimate facts must be one which in the common experiences of men may reasonably be made.” Davis v. State, 90 So.2d 629, 631 (Fla.1956); accord Singleton v. State, 105 So.3d 542, (Fla. 2d DCA 2012). Thus, the only evidence connecting Miranda to the crimes charged is circumstantial and we must apply the circumstantial evidence standard of review on appeal. See Singleton, 105 So.3d 542; Egberongbe v. State, 765 So.2d 108, 110 (Fla. 1st DCA 2000).
Our review of the denial of a motion for judgment of acquittal is de novo. Pagan v. State, 830 So.2d 792, 803 (Fla.2002). Where “the evidence of guilt is wholly circumstantial, it is the trial judge’s task to review the evidence in the light most favorable to the State to determine the presence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences.” Crain v. *56 State, 894 So.2d 59, 71 (Fla.2004) (citing State v. Law, 559 So.2d 187, 189 (Fla.1989)). “Suspicions alone cannot satisfy the State’s burden of proving guilt beyond a reasonable doubt....” Ballard v. State, 923 So.2d 475, 482 (Fla.2006). Moreover, absent other evidence of identity, the State must establish that the circumstantial evidence of Miranda’s guilt — his blood-DNA — was left at the scene at the time of the murder. See id. at 483; Hill v. State, 973 So.2d 655, 655-56 (Fla. 2d DCA 2008); Mutcherson v. State, 696 So.2d 420, 422 (Fla. 2d DCA 1997); cf. Burkett, 992 So.2d at 851-52 (distinguishing Ballard based on footprint evidence establishing that defendant had been at the scene of the murder at or near the time of the murder and directly contradicting defendant’s statements).
The State’s case, reduced to its core, rested on the following: (1) Miranda’s nationality — he is Cuban; (2) the camouflage shirt, which was present at the scene prior to the victim’s murder; and (3) the bolt cutters, found some distance from the scene. There was no evidence presented as to when or how Miranda’s blood was transferred to the shirt or bolt cutters. In fact, the State’s evidence established that it was impossible to determine the age of the blood on the bolt cutters or how the blood was transferred to them. The State’s evidence did not establish the age of the blood on the camouflage shirt or how the blood was transferred to it. See Ballard, 923 So.2d at 483. Perhaps more importantly, Ms. Molina’s testimony was exculpatory and supported Miranda’s argument that he was not present during the victim’s murder. Ms. Molina testified that Miranda did not look like one of the three men she saw in her home on November 30. Miranda’s hypothesis of innocence was that he had never been to Punta Gorda or to the victim’s property; he lived in Miami. His explanation for how his blood came to be on the camouflage shirt and bolt cutters was that one of the victim’s marijuana grow-house workers from Miami left the items on the property.[7] This explanation tied into the State’s apparent theory that the victim was killed as a result of his involvement in drug trafficking.[8]
Although the presence of Miranda’s blood-DNA tended to show guilt, the State’s evidence failed to establish Miranda’s presence at the scene at the time of the murder and is not “competent evidence from which the jury could infer guilt to the exclusion of all other inferences.” Crain, 894 So.2d at 59; accord Ballard, 923 So.2d at 482. Cf. Nshaka v. State, 92 So.3d 843, 849 (Fla. 4th DCA 2012); Leonard v. State, 731 So.2d 712, 719 (Fla. 2d DCA 1999). Finally, Ms. Molina’s testimony rebutted the critical element of eausa-tional identity. See Egberongbe, 765 So.2d at 110; cf. Cordero-Artigas v. State, 75 So.3d 838, 841-42 (Fla. 2d DCA 2011). Her testimony refuted the inference of guilt created by the blood-DNA and creat *57 ed reasonable doubt. See Egberongbe, 765 So.2d at 111.
The State’s evidence was insufficient to withstand the motion for judgment of acquittal and to convict Miranda. See Ballard, 923 So.2d at 482. As a result, the trial court erred in denying the motion.
Reversed and remanded with instructions to enter a judgment of acquittal.
ALTENBERND and LaROSE, JJ., Concur.

. On cross-examination, Ms. Molina testified that she did not recall whether she had called the victim’s brother and nephew before running to the neighbor's house for assistance.

. Ms. Molina testified that she administered CPR; however, the neighbor testified that he and another neighbor administered CPR while Ms. Molina remained “nonchalant.”

. On cross-examination, Ms. Molina testified that she had not recalled anything about the camoflauge shirt when initially questioned by the police and that it was only in a later interview that she remembered seeing it in the house.

.Miranda was the only person charged with the murder of the victim. Nothing in our record suggests that Miranda identified other potential suspects or otherwise "flipped” on the perpetrators. Ms. Molina also was unable to identify other potential suspects from the lineup.

. Miranda was convicted of second-degree murder with a firearm. The State concedes that it failed to prove Miranda actually possessed a firearm and that the firearm portion of the judgment should be stricken. See § 775.087(1); Powell v. State, 724 So.2d 1207, 1207-08 (Fla. 2d DCA 1998).

. Although he argues an impermissible stacking of inferences on appeal, see Miller v. State, 770 So.2d 1144, 1149 (Fla.2000), Miranda’s motion for judgment of acquittal did not include an inference-stacking argument. Therefore, it is not preserved for appeal. See Victorino v. State, 23 So.3d 87, 103 (Fla.2009).

. Miranda contended that the grow-house workers were from Miami, a city the victim and Ms. Molina frequented. On appeal, Miranda raises the propriety of admitting the grow-house evidence at trial; however, we do not reach the issue. The importance of the grow-house evidence for purposes of this opinion is limited to its relevance to Miranda’s claim of innocence.

. In addition to admitting the grow-house evidence, the court also overruled Miranda’s objection and permitted the State to present, in its opening argument, that the victim had recently started carrying a gun and that the morning of his death the victim left a phone message for someone, saying: "They’re going to hold that against me. You need to call me back immediately.” No testimony was presented as to the phone message, and Miranda raises the denial of his motion for mistrial based on this issue in his appeal.