MORRIS, Judge.
Appellant’s motion for written opinion is granted. We withdraw this court’s per curiam affirmance issued on May 29, 2013, and substitute it with the following opinion.
Eric Tate appeals his convictions for felony murder and aggravated child abuse. On appeal, Tate argues that the trial court erred in denying his motion for judgment of acquittal and that the trial court erred in answering the jury’s question regarding access to transcripts of witness testimony. We conclude that neither error was preserved and that neither error amounts to fundamental error.
I. Motion for judgment of acquittal
Tate first claims that the trial court erred in denying his motion for judgment of acquittal because the State failed to present evidence that he knowingly, intentionally, and purposefully intended to harm the victim, H.R. Tate argues that the State failed to present evidence that was inconsistent with his reasonable hypothesis of innocence that H.R. accidentally fell off the couch.
At the conclusion of the State’s case, defense counsel made a boilerplate motion for judgment of acquittal by arguing that “the State has failed to make a prima facie case as it relates to either Count One or Count Two.” This was in *626 sufficient to preserve the alleged error for appellate review.[1] Miller v. State, 712 So.2d 451, 452 (Fla. 2d DCA 1998). However, this court may consider the issue, under the fundamental error doctrine, if “the evidence [was] insufficient to show that a crime was committed at all.” F.B. v. State, 852 So.2d 226, 230 (Fla.2003). The only issue is whether H.R.’s injuries were accidental or inflicted by Tate; therefore, the analysis is the same regardless of whether the issue was preserved.
“ ‘Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence.’ ” Darling v. State, 808 So.2d 145, 155 (Fla.2002) (quoting State v. Law, 559 So.2d 187, 188 (Fla.1989)).[2] “ ‘A motion for judgment of acquittal should be granted in a [wholly] circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt.” Id. at 155-56 (quoting Law, 559 So.2d at 188). The “[c]ireumstantial evidence must lead ‘to a reasonable and moral certainty that the accused and no one else committed the offense charged.’ ” Cox v. State, 555 So.2d 352, 353 (Fla.1989) (citing Hall v. State, 90 Fla. 719, 107 So. 246, 247 (1925)).
In order to prove the offense of aggravated child abuse and the offense of felony murder resulting from the aggravated child abuse, the State proceeded under the theory that Tate knowingly or willfully abused H.R., causing her great bodily harm, permanent disability, or permanent disfigurement. See § 827.03(l)(a)(3), Fla. Stat. (2006). The defense presented the theory that H.R., who was then two and one-half years old, died from brain injuries she sustained from an accidental fall from the couch while in the sole care of Tate. In support of that defense, the defense presented the detailed testimony of Dr. Edward Willey, a physician and pathologist who had performed approximately 900 autopsies between 1963 and 1967 and who was board certified in anatomical pathology. For the past twenty-six years, he has served as a professional consultant, sometimes performing private autopsies. Dr. Willey testified that H.R.’s bruises did not suggest abuse and could have been caused by a clotting issue brought on by the brain injuries she suffered and that H.R.’s optic and retinal hemorrhages were not obvious indicators of abuse. Dr. Willey testified that H.R.’s injuries could have been caused by a fall from a couch as reported by Tate and that he [Dr. Willey] could not say that H.R. “could have only” died from inflicted trauma. He admitted that H.R.’s injuries could have been inflicted.
The defense also presented the detailed testimony of Chris Van Ee, a biomedical engineer who conducts research in impact and orthopedic biomechanics. He studies how injuries are caused and how they can be prevented. He conducted a reconstruc *627 tion of the fall as reported by Tate and testified that the fall could have caused serious and even fatal head injury. He testified that a study showed that children can suffer subdural hematomas and retinal hemorrhages and die from short falls, citing specific instances of falls resulting in such injury and death. However, he said that it is not a common occurrence and that it is rare. He also did not take into account the bruising on H.R.’s body.
The State presented evidence that H.R.’s injuries were inflicted and not the result of a fall. The State presented detailed medical testimony that is summarized as follows: Dr. Maximo Luque specializes in pediatric emergency medicine at St. Joseph’s Hospital. He is board certified in adult emergency and pediatric medicine and in the subspeciality area of pediatric emergency medicine. He has been working exclusively in pediatric emergency medicine since 1984. He has treated approximately 200,000 children in twenty-eight years.
Dr. Luque treated H.R. when she was brought into St. Joseph’s emergency room. He testified that the victim had “some bruising on both earlobes and also bruising in the lower back,” which was not caused by the lifesaving measures. H.R. had significant brain injuries (a subdural hemato-ma and herniation) and retinal hemorrhages that were likely caused by significant deceleration force. A short fall from a couch was “absolutely not” consistent with H.R.’s injuries, based on Dr. Luque’s years of experience in the pediatric emergency room setting. He opined that “this was a non-accidental injury, it was an inflicted injury to the child.” Dr. Luque testified that he remains current and reads literature in the field of short and longer fall injuries, and he was currently the codirector of the Child Abuse Initiative at St. Joseph’s. The bruises on H.R.’s earlobes also contributed to his opinion that her injuries were inflicted.
Dr. Luque testified in detail that brain injuries do not “produce abnormalities” in blood clotting and that H.R.’s blood work was slightly above normal, which was of no consequence. H.R.’s bruising was not caused by a clotting problem, and Dr. Lu-que did not believe that H.R. developed a clotting condition due to the injury. Dr. Luque testified that intracranial pressure can cause retinal hemorrhaging and that it was significant that H.R. had the retinal hemorrhages. He opined that there are many ways to get them but “[f]rom trauma specifically you require a significant injury, much more ... than falling off a sofa.” A person can also get them by being shaken.
Dr. Luque considered all of the injuries together to conclude that H.R.’s injuries were inflicted. They “require[d] a significant force, much more than just falling off the couch.” He had “never seen one with these type of injuries that result[ed] from a minor fall.” They could happen from a number of things, such as shaking, blunt force to the head, or the child’s being thrown. When asked if his opinion would change if he tried to figure out how the injury happened “from a physics principle,” Dr. Luque answered, “No, ma’am. I don’t need to do that. I know it.” The State asked, “[T]o a reasonable degree of scientific certainty what is your opinion as to what caused the injuries on H.R,” and Dr. Luque answered, “To me[,] the injuries of this patient were non-accidental.... My opinion is that this patient’s injuries were consistent with inflicted injury and not accidental.”
The State also presented the testimony of Dr. Carl Riggs, who had been practicing medicine for thirty years. He was currently a critical care specialist, primarily treating children. He had been board certified in pediatric critical care medicine for *628 twenty-three years. He had seen approximately 2100 children a year for thirty years. He had been qualified as an expert in critical care pediatrics probably “a couple dozen” times. Dr. Riggs treated H.R. in the intensive care unit (ICU) at St. Joseph’s. When he examined her, she had early bruises, probably within 48 hours, which he did not believe were caused by medical intervention. Even though he did not measure the couch H.R. had reportedly been jumping on, he had enough medical information to form an opinion as to the cause of H.R.’s injuries. His opinion was that a fall off the couch “wasn’t consistent with this degree of injury.” “To come to the emergency room dead requires a significant amount of injury to that brain.” Even if the child had jumped intentionally off the couch and hit her head on the floor, his opinion as to the cause of the injuries would not change. Retinal hemorrhages are associated with certain types of inflicted injuries. Dr. Riggs testified that the retinal hemorrhages could have possibly occurred from a fall from a couch, but the most likely cause of H.R.’s injuries was a “non-accidental trauma.” There was no sign of any acute or chronic illness or clotting disorder.
Dr. Riggs explained that the “constellation [of injuries] is really significant for being a non-accidental injury.” The bruising on the ears indicates a type of blow or pinch. He testified that studies about G forces and the like obviously cannot use real people and are conducted with dummies in efforts to try to simulate things as best they can. In his thirty years of working with children, he had never seen such injuries from a child falling off a couch. Even if she had thrown herself off the couch, he did not believe that such a velocity would explain all of her injuries.
The State also presented the testimony of Dr. Leszek Chrostowski, who performed the autopsy on H.R. He is board certified in the fields of pathology and forensic pathology. He has been practicing in the U.S. since 1995. He had performed hundreds of autopsies on children and 5000 to 6000 autopsies in his career. In his opinion, H.R. died from cerebral trauma, and the manner of death was homicide, which means H.R. died at the hands of another person and due to injuries to her brain. He testified to her specific injuries, including her bruises and brain injuries. He tested her blood and did not find any chronic coagulation disorder or clotting disorder from those tests or his autopsy.
During the autopsy, he noted bruising and chronic inflammation in the genitalia. The age of the bruising looked similar to the other bruises, which looked like fresh bruises occurring around the same time as the other injuries. During his testimony, the jury was shown photographs of H.R.’s injuries and photographs taken during the autopsy.
Dr. Chrostowski testified that the combination of injuries indicated two separate impacts that were severe enough to cause severe brain injury. The impact injuries to H.R.’s head were 135 degrees apart, not 90 degrees as the defense suggested. A fall from a couch on H.R.’s right side would not have caused the injuries on the left side of her head or neck. Each of the bruises “indicates a single impact.” While it was possible that a fall from a couch could be potentially serious and injurious, it has only been documented in a handful of studies. “The reverse is numerous. That short falls do not cause severe injuries.” Medical intervention very seldomly causes bruises, but it is possible. Dr. Chrostowski testified that H.R.’s bruises were not the result of a clotting disorder because she did not have them inside her body, in her organs or her GI tract, for example. He testified that the “optic *629 nerve sheath hemorrhages ... finding is really bad, it’s really bad.”
Lieutenant Hyatt was the paramedic who arrived on the scene and placed the C-collar on H.R. He believed that it was very unlikely that the C-collar would cause bruising.
In addition to the medical evidence, the State presented the testimony of H.R.’s grandmother, who testified that she babysat H.R. the night before the incident and that she did not notice any markings or bruises on H.R. when she gave H.R. a bath. H.R.’s mother, Tate’s girlfriend at the time, testified that she left H.R. in Tate’s care the morning of the incident and that she did not notice bruises on her face that morning. When she returned home after the incident, she observed bruising all over H.R.’s face.
In sum, the whole of the State’s evidence proved that H.R. was abused while in Tate’s care and that her death was caused by the abuse. H.R.’s two treating doctors and the medical examiner provided overwhelming expert testimony from which a jury could conclude beyond a reasonable doubt that H.R.’s injuries were inflicted by someone else. Dr. Luque specifically testified that within a reasonable degree of medical certainty, H.R.’s injuries were inflicted and not accidental. This was more than the State was required to prove. See Buenoano v. State, 527 So.2d 194, 197-98 (Fla.1988) (“Expert medical testimony as to the cause of death need not be stated with reasonable certainty in a homicide prosecution and is competent if the expert can show that, in his opinion, the occurrence could cause death or that the occurrence might have or probably did cause death.” (citing Delap v. State, 440 So.2d 1242 (Fla.1983))). Tate’s hypothesis of innocence was that H.R. suffered her injuries from a fall off the couch and that her bruises were the result of clotting issues caused by the brain injuries, and while Tate presented evidence that this was possible, the State presented evidence to rebut that theory.
Tate suggests that the State was required to prove that it was impossible for H.R.’s injuries to be the result of an accidental fall. But this is inaccurate. In order to find guilt beyond a reasonable doubt, the jury must have an abiding conviction of guilt that does not waver or vacillate. See Fla. Std. Jury Instr. (Crim.) 3.7. “A reasonable doubt is not a mere possible doubt, a speculative, imaginary or forced doubt.” Id. Even if the evidence could present a mere possible doubt as to the cause of H.R.’s injuries, this would not be enough to take the issue away from the jury when the State presented evidence from which the jury could find beyond a reasonable doubt that Tate inflicted the injuries on H.R. Once the State presented evidence that was inconsistent with the defense’s theory of events and from which a jury could infer guilt to the exclusion of all other inferences, it became a question for the jury to decide. See Orme v. State, 677 So.2d 258, 262 (Fla.1996).
Tate suggests that the State failed to prove that Tate intentionally abused H.R. “Because direct evidence of intent is rare, and intent is usually proven through inference, ⅛ trial court should rarely, if ever, grant a motion for judgment of acquittal on the issue of intent.’ ” Manuel v. State, 16 So.3d 833, 835 (Fla. 1st DCA 2005) (quoting Washington v. State, 737 So.2d 1208, 1215 (Fla. 1st DCA 1999)); see also Green v. State, 90 So.3d 835, 837 (Fla. 2d DCA 2012) (holding that intent “is rarely susceptible of direct proof’ and “is almost always shown solely by circumstantial evidence” (citing Sebastiano v. State, 14 So.3d 1160, 1165 (Fla. 4th DCA 2009))); S.D. v. State, 882 So.2d 447, 448 (Fla. 4th DCA 2004) (“Intent to commit a battery *630 must be determined by the circumstances surrounding the touching or striking of the victim.”)- “Where reasonable persons may differ as to the existence of facts tending to prove ultimate facts, or inferences to be drawn from the facts, the case should be submitted to the jury.” King v. State, 545 So.2d 875, 378 (Fla. 4th DCA 1989) (holding that where “the evidence lend[ed] itself to different reasonable inferences on the issue of intent, ... the trial court properly submitted the case to the jury to determine if King was criminally liable for the death of the victim”).
There was testimony that the extent and nature of H.R.’s injuries indicated that the injuries were intentionally inflicted. In addition, the State presented evidence suggesting that Tate had sexually abused H.R. that morning. Tate himself brought up the issue of sexual abuse when he mentioned it to the responding officers on the day of the offense. At the house, Detective Warren noticed a quarter-size stain that appeared to be blood on a purple pair of underwear on Tate’s bed. Tate told Detective Warren that Tate noticed the stain when he was dressing H.R. and that Tate asked H.R. if someone had been molesting her. Detective Valles also testified that at the station, Tate told Valles that when he was changing H.R.’s panties that morning, “he noticed the one she was wearing had blood on it in the crotch area[ ] and he asked her has anyone been molesting you.” In addition, before Tate was taken down to the station, he changed clothes and was seen by one of the detectives placing a napkin in his pocket. This napkin was recovered at the station and appeared to have blood stains on it; it was later proven to contain both H.R.’s and Tate’s DNA. The medical evidence also showed that H.R. had inflammation and bruising on her genitalia. This evidence suggesting sexual abuse, when considered with the strong medical evidence of inflicted injuries, was sufficient for the jury to conclude beyond a reasonable doubt that H.R. had the requisite intent.
Tate relies on two cases in arguing that the State’s circumstantial evidence was insufficient to sustain his convictions. See Ballard v. State, 923 So.2d 475 (Fla.2006); Miranda v. State, 113 So.3d 51 (Fla. 2d DCA 2013). These cases are distinguishable because they involved purely circumstantial evidence that the defendants were the perpetrators of the crimes and the State did not present evidence inconsistent with the defendants’ theories of innocence. See Ballard, 923 So.2d at 476-82; Miranda, 113 So.3d at 52-55. Here, there was testimony from H.R.’s mother that Tate was home alone with H.R. when she suffered the injuries, and Tate admitted to police that he was home alone with H.R. Therefore, there was no question regarding the identity of the perpetrator. And as discussed above, the State presented evidence that was inconsistent with Tate’s reasonable hypothesis of innocence that the injuries were the result of an accidental fall off the couch.
We conclude that there was competent, substantial evidence to support Tate’s convictions for aggravated child abuse and felony murder.
II. Jury’s request for transcripts
Tate further argues that the trial court committed fundamental error in answering the jury’s question regarding access to the transcripts of the testimony. He contends that the trial court’s answer may have misled the jury into believing that read-backs of testimony are prohibited.
During deliberations, the jury asked the following question: “We the jury respectfully request an interpretation of the law as it pertains to our access to court tran *631 scripts of witness testimony.” The State suggested that the trial court “tell them that they can[’t] get that and that they have to rely on their open memory.” Defense counsel said that he agreed. The trial judge did not “think it would be appropriate for us to tell them we can’t give you the transcript, but we can let you have the testimony read back to you.” So the trial court decided to tell the jury that “transcripts of witness testimony are not available. You must rely on your recollection of the witness’s testimony.” Defense counsel twice again stated that he was fine with that.
During the pendency of Tate’s direct appeal, the supreme court held that when the jury submits a general request for transcripts, it is error to instruct the jury members to rely on their own recollection of the testimony without informing them that they may request a read-back of testimony. Hazuri v. State, 91 So.3d 836, 845 (Fla.2012). This is because “[a] jury is composed of laypersons often unfamiliar with legal terms of art[ ] and there should be no magic words required for a read-back request, especially when the intent of the jury’s request for transcripts is clear.” Id. The court adopted two rules: “(1) a trial court should not use any language that would mislead a jury into believing read-backs are prohibited, and (2) when a jury requests trial transcripts, the trial judge should deny the request, but inform the jury of the possibility of a read-back.” Id. at 846.
In Hazuri, the jury made a general request for trial transcripts, and “the trial court instructed the jury ... to rely on its own collective recollection of the evidence, contrary to defense counsel’s suggestion that the trial court should inform the jury of the availability of read-backs.” Id. Defense counsel in Hazuri objected and asked the trial court to note the objection for the record. The supreme court held that the trial court “erred in failing to inform the jury of its right to request a read-back in response to its request for trial transcripts” and “in failing to instruct the jury to clarify which portion of the testimony the jury wished to review.” Id. at 846. Because the trial court never clarified which portion of the transcripts the jury wished to review, the supreme court could not determine the effect of the error and therefore reversed for a new trial. Id.
In this case, the trial court committed the same error as in Hazuri,[3] But in this case, defense counsel did not object. In fact, he agreed to the trial court’s response to the jury’s question. Therefore, this case is distinguishable from Hazuri and the issue was not preserved in this case. See id. at 840 (finding it significant that defense counsel suggested that the trial court inform the jury about the possibility of read-backs); see also State v. Barrow, 91 So.3d 826, 835 (Fla.2012) (noting that a similar error in that case was preserved by defense objection).
We conclude that this error does not amount to fundamental error. See Delestre v. State, 103 So.3d 1026, 1028 (Fla. 5th DCA 2012) (citing Frasilus v. State, 46 So.3d 1028, 1031 (Fla. 5th DCA 2010)). “One reason for appellate courts’ reluctance to find fundamental error is to discourage the creation of ‘gotchas’ whereby the defense is allowed to sit on its rights and say nothing until after it sees whether the jury returns an adverse verdict.” Id. (citing Hendricks v. State, 34 So.3d 819, 830 (Fla. 1st DCA 2010)). *632 “Furthermore, the failure of a defense attorney to request instructions on the availability of a read-back may well be strategic” in that “[djefense counsel may well believe that it would not be in the defendant’s best interest to have certain testimony emphasized.” Id.
As the State points out, this court previously held in LaMonte v. State, 145 So.2d 889, 892-93 (Fla. 2d DCA 1962), that the trial court committed fundamental error when the jury posed two specific questions about the testimony and the trial court failed to read back the testimony. But the court in LaMonte relied on an old statute, which required a mandatory read-back upon a question by the jury showing any doubt or disagreement about the testimony. Id. at 893. That statute has since been repealed and replaced with a procedural rule making read-backs discretionary with the trial court. See Frasilus, 46 So.3d at 1031-32 (explaining that the applicable statute when LaMonte was decided required a mandatory read-back but that the statute was repealed and replaced with Florida Rule of Criminal Procedure 3.410, which was subsequently revised to make the read-back discretionary). Therefore, LaMonte is not applicable to this case, and Tate is not entitled to a new trial based on the trial court’s erroneous response to the jury’s inquiry regarding transcripts.
III. Conclusion
Based on the reasoning set forth above, we affirm Tate’s convictions for felony murder and aggravated child abuse.
Affirmed.
SILBERMAN and KELLY, JJ., Concur.

. Below, Tate also made the specific argument that the offenses of aggravated child abuse and felony murder must be merged because there was only one act of aggravated child abuse. This specific issue is different from the one Tate now asserts on appeal. See F.B. v. State, 852 So.2d 226, 229 (Fla.2003).

. We note that the special circumstantial evidence standard applied by Florida courts has been called into question by the Fifth District in Knight v. State, 107 So.3d 449 (Fla. 5th DCA 2013). See also Rocker v. State, 122 So.3d 898 (Fla. 2d DCA 2013) (Villanti, J„ dissenting) (agreeing with Knight that the supreme court should reconsider the special circumstantial evidence standard); State v. Sims, 110 So.3d 113, 117-18 (Fla. 1st DCA 2013) (Thomas, J., dissenting) (same).

. We note that the trial court did not have the benefit of Hazuri because it was decided in May 2012, a year after the trial in this case.