# Supreme Court of Florida

_____

No. SC13-1004
_____

**DERRAL WAYNE HODGKINS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[June 18, 2015]

PER CURIAM.

This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Because we find that the record lacks competent, substantial evidence to sustain the conviction, we reverse and vacate Hodgkins' conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

Derral Hodgkins was convicted of the first-degree murder of Teresa Lodge. The record reflects that in September 2006, Lodge lived alone in a first-floor unit at the Lakeside Apartments complex of Land O'Lakes, Pasco County, Florida. At

that time, she worked primarily as a cook, manager, and dishwasher at Frank's Café, a breakfast restaurant that was located in a strip mall directly across the street from her apartment. Lodge typically worked at Frank's Café from 6 a.m. to approximately 2 p.m. on weekdays.

During the week of her death, Lodge worked full shifts at the restaurant on Monday and Tuesday, September 25 and 26, 2006. Around 10 p.m. on that Monday, Melanie Zakel visited Lodge at home. The two spent the evening talking, joking, and cleaning Lodge's apartment until approximately 2 or 3 a.m. on Tuesday morning. At some point that evening, Hodgkins visited the apartment. Zakel testified that Lodge's voice became uneasy as Lodge and Hodgkins conversed at the front door, but that at no point did Hodgkins enter the apartment or make contact with Lodge. Hodgkins stayed for approximately five minutes, and that was the first and last time before trial that Zakel saw him. According to Zakel, Lodge appeared aggravated after Hodgkins left. Zakel left the apartment around 4:30 a.m. because Lodge needed to shower and get ready for work.

Lodge worked a partial shift at Frank's Café on Wednesday, September 27, 2006. She spent most of the morning training a new employee on the procedures for cooking the food and running and cleaning the restaurant. Lodge left work between 9 and 10 a.m. to attend a doctor's appointment. She later called the

restaurant at 2:23 p.m., and that was the last time anyone from the restaurant spoke with Lodge.

On Thursday, September 28, 2006, Leslie Thomas, Lodge's coworker, attempted to pick up Lodge for work. Thomas called Lodge's cell phone around 5:30 a.m. and, upon arriving at the apartment, knocked on the door as well as the bedroom and bathroom windows, but Lodge did not answer. The door was locked, but Thomas noticed that both the light and television in the bedroom were on. Thomas eventually left to open Frank's Café.

Other people subsequently stopped by Lodge's apartment to check on her but could not open the door. The State presented testimony that a spare key to the apartment that was usually hidden outside was missing prior to these events. Having not heard from Lodge, Thomas called Dawn Williams around noon and instructed her to check on Lodge because Williams had another spare key to the apartment.[1]

At approximately 1 p.m., Williams summoned law enforcement to Lodge's apartment, and Sergeant Larry Engle of the Pasco County Sheriff's Office (PCSO) responded to the scene. Upon entering the apartment using Williams' spare key, Engle found Lodge's body in the bedroom near the foot of the bed lying face up on

_____

    1. Williams passed away before trial and, therefore, was unavailable to testify.

the floor. Lodge's skin was discolored; her body had multiple injuries, including a large, gaping wound on her neck; a pool of dried blood surrounded her head; and there was blood on her face, shirt, and mouth. There also were eyeglasses adjacent to Lodge's body, multiple twenty-dollar bills underneath her body and the bed, and a large quantity of cash in a purse sitting on the bed. Engle testified that the apartment was orderly and well-kept, and that there were no signs of forced entry.

Responding forensic investigators collected, among other things, scrapings from underneath Lodge's fingernails as well as her fingernail clippings. They also collected from the kitchen a beer bottle bearing what was later identified as Lodge's blood. Additionally, twenty-one sets of fingerprints were lifted from the crime scene, three of which belonged to Lodge; the remainder were unidentified. No murder weapon was recovered.

An autopsy of Lodge's body was performed on September 29, 2006. According to medical expert testimony, Lodge suffered thirty-two bodily injuries during the commission of the crime. Lodge's death was ruled a homicide caused by sharp-force injuries, including seven stab wounds to the torso and abdomen and three incised wounds to the neck resulting in the severance of the external jugular vein. Medical expert testimony also indicated that manual strangulation was a contributing factor of Lodge's death. No injuries were found on her hands or arms, indicating a lack of defensive wounds.

On or about November 1, 2007, the Florida Department of Law Enforcement (FDLE) submitted a report to PCSO Detective Melborne Eckley, indicating that a DNA profile type consistent with that of Hodgkins was detected underneath the fingernails of Lodge's left hand. On November 6, Eckley and his partner, Detective Steve Foshey, obtained Hodgkins' consent to interview him in the living room of his house. Based on the transcript of the interview, which was recorded, Hodgkins told Eckley and Foshey that he and Lodge dated sometime between 1985 and 1987. Hodgkins said that in 2004, he visited Lodge at her Lakeside apartment and, at that time, Lodge told him that she was dealing cocaine and did not want him to be involved if she were arrested for it. Hodgkins also told Eckley and Foshey that he had not gone back to Lodge's apartment since then, and that the last time he saw Lodge was a month-and-a-half to two months prior to her death. Hodgkins explained that he and Lodge encountered one another at a Circle K convenience store down the street from Lodge's apartment, and that they hugged and kissed before parting ways.

One week later, Eckley and Foshey conducted a second recorded interview with Hodgkins, again in his living room. After Eckley confronted Hodgkins with the FDLE report concerning Hodgkins' DNA, Hodgkins explained that his DNA was under the fingernails because Lodge would scratch his back whenever they hugged. Hodgkins further explained that Lodge scratched his back when they last

saw each other and hugged at the convenience store a month-and-a-half before the murder. Hodgkins initially told Eckley and Foshey that the last time he and Lodge engaged in sexual intercourse was in the late 1980s when they dated. Hodgkins later admitted that he lied, explaining that he and Lodge had sex two other times, and that Lodge scratched his back during one of those times. Hodgkins first indicated that the second sexual rendezvous occurred around the time of the Circle K encounter—a month-and-a-half before the murder—but then changed the timeframe to two weeks after that encounter—sometime in August. Upon further questioning, Hodgkins again admitted that he lied, this time stating that he had sex with Lodge three days before she was killed, and that Lodge left six scratches on his back due to an orgasm. Hodgkins also explained that he lied because he did not want his then-wife to learn of his infidelity. Hodgkins also reasoned that, because he made contact with Lodge so close to her death, he did not want detectives accusing him of murder. Despite the detectives' repeated insistence, Hodgkins denied killing Lodge.

Hodgkins was arrested on November 18, 2007, and charged with the premeditated first-degree murder of Lodge. During the August 2011 trial,[2] after the State closed its case, the court denied the defense's motion for a judgment of acquittal for failure to present evidence inconsistent with the theory that Hodgkins'

---

2. Hodgkins was initially tried in January 2011, which ended in a mistrial.

DNA was deposited underneath Lodge's fingernails several days before her death and remained there until it was collected. Subsequently, the jury returned a verdict finding Hodgkins guilty as charged and, following the penalty phase and Spencer[3] hearing, the court imposed a sentence of death.

This appeal follows.[4] Because we conclude that the State failed to introduce competent, substantial proof that Hodgkins killed Lodge, we limit the following discussion to the sufficiency of the evidence.

## STANDARD OF REVIEW

In every capital case involving the imposition of the death penalty, this Court independently reviews the record to ensure there is legally sufficient evidence to sustain the conviction. Dausch v. State, 141 So. 3d 513, 517 (Fla. 2014). There is sufficient evidence to sustain a conviction "if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt." Johnston v.

---

3. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

4. On appeal, Hodgkins raises five issues: whether (1) the State proved Hodgkins committed the murder; (2) the State proved premeditation; (3) the trial court erred by limiting cross-examination of a prosecution witness regarding a pending criminal charge; (4) the trial court erred by ordering that Hodgkins remain in visible, physical restraints during the penalty phase; and (5) Florida's capital sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002).

State, 863 So. 2d 271, 283 (Fla. 2003) (citing Banks v. State, 732 So. 2d 1065 (Fla. 1999)).

However, purely circumstantial cases, such as this one, are reviewed differently:

> A special standard of review of the sufficiency of the evidence applies where a conviction is wholly based on circumstantial evidence. Jaramillo v. State, 417 So. 2d 257 (Fla. 1982). Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. McArthur v. State, 351 So. 2d 972 (Fla. 1977); Mayo v. State, 71 So. 2d 899 (Fla. 1954). The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse. Heiney v. State, 447 So. 2d 210 (Fla.), cert. denied, 469 U.S. 920 (1984); Rose v. State, 425 So. 2d 521 (Fla. 1982), cert. denied, 461 U.S. 909 (1983), disapproved on other grounds, Williams v. State, 488 So. 2d 62 (Fla. 1986).

Thorp v. State, 777 So. 2d 385, 389 (Fla. 2000) (quoting State v. Law, 559 So. 2d 187 (Fla. 1989)). Further,

> [i]n meeting its burden, the State is not required to "rebut conclusively, every possible variation of events" which could be inferred from the evidence, but must introduce competent evidence which is inconsistent with the defendant's theory of events. Darling[ v. State, 808 So. 2d 145, 156 (Fla.)] (quoting Law, 599 So. 2d at 189). Once the State meets this threshold burden, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt. Id.

Johnston, 863 So. 2d at 283. We reiterate, however, that "[a]lthough the jury is the trier of fact, a conviction of guilt must be reversed on appeal if it is not supported

by competent, substantial evidence." Lindsey v. State, 14 So. 3d 211, 215 (Fla. 2009) (quoting Ballard v. State, 923 So. 2d 475, 482 (Fla. 2006)) (internal quotation marks omitted).

Finally, this Court has instructed that "[s]uspicions alone cannot satisfy the State's burden of proving guilt beyond a reasonable doubt[.]" Ballard, 923 So. 2d at 482. In fact, we have held that "even a 'deep suspicion the appellant committed the crime charged is not sufficient to sustain [a] conviction.' " Lindsey, 14 So. 3d at 216 (quoting Williams v. State, 143 So. 2d 484, 488 (Fla. 1962)).

> Evidence which furnishes nothing stronger than a suspicion, even though it would tend to justify the suspicion that the defendant committed the crime, [ ] is not sufficient to sustain [a] conviction. It is the actual exclusion of the hypothesis of innocence which clothes circumstantial evidence with the force of proof sufficient to convict. Circumstantial evidence which leaves uncertain several hypotheses, any one of which may be sound and some of which may be entirely consistent with innocence, is not adequate to sustain a verdict of guilt. Even though the circumstantial evidence is sufficient to suggest a probability of guilt, it is not thereby adequate to support a conviction if it is likewise consistent with a reasonable hypothesis of innocence.

Dausch, 141 So. 3d at 518 (quoting Ballard, 923 So. 2d at 482) (alterations in original).

We have reversed first-degree murder convictions even where the State's circumstantial case involved more forensic evidence than that introduced at Hodgkins' trial. Ballard, in particular, involved two neighbors and long-time friends of Ballard who were found robbed and beaten to death in their apartment.

- 9 -

The evidence of guilt consisted of Ballard's fingerprint on the bedframe near the body of one of the victims, and a hair found on the victim's hand that was consistent with Ballard's telogen-phase arm hair. Ballard, 923 So. 2d at 483. In concluding this evidence was insufficient to sustain Ballard's convictions, we noted the lack of direct evidence showing when the hair and print were left or how they came to be left in their locations. Id. We further determined that, while "prov[ing] that Ballard was in [the victims'] apartment at some point in time," the State's evidence "did not refute the possibility of his prior innocent presence in the bedroom as accounting for the hair and print." Id. at 484. Additionally, the following circumstances were important to our determination: there were no eyewitnesses to the crime; the murder weapon was never recovered; none of the other recovered fingerprints were identified as Ballard's; the State presented no evidence of Ballard having hatred or ill feelings towards the victims; nor was there any evidence that Ballard had any interest in robbing the victims; Ballard made no admissions about the crimes; and no one testified about any suspicious conduct on his part. Id. at 484-85. Accordingly, we reversed Ballard's convictions, vacated his death sentences, and remanded for the entry of a judgment of acquittal. Id. at 486.

As the circumstances in Ballard are substantially similar to those found in this case, we again conclude "that the State's evidence, while perhaps sufficient to

- 10 -

create some suspicion, is simply not strong enough to support a conviction." See id. at 483 (citing Jaramillo, 417 So. 2d 257).

## THIS CASE

To prove first-degree premeditated murder, the State was required to establish that: (1) the victim, Lodge, is dead; (2) Lodge's death was premeditated; and (3) Lodge's death resulted from the criminal act of the defendant, Hodgkins. See Dausch, 141 So. 3d at 517 (citing Fla. Std. Jury Instr. (Crim.) 7.2).

At trial, the State's entire circumstantial case encompassed the following evidence: (1) statements from Hodgkins wherein he lied to detectives about his last time seeing and engaging in sexual intercourse with Lodge; (2) medical testimony explaining the manner of death, including manual strangulation followed by sharp-force injuries; (3) Lodge's cleaning habits at home and at work, including washing her hands and nails for three minutes each time; (4) observations of Lodge's cleaning and handling raw foods at Frank's Café on Monday, Tuesday, and Wednesday the week of her death; (5) DNA material found underneath Lodge's fingernails matching Hodgkins' DNA; and (6) expert testimony that the DNA material was robust when collected, it would have significantly degraded since the Monday before Lodge's death, and based on Lodge's hygienic activities and factors likely to degrade DNA material, the foreign DNA found underneath Lodge's fingernails on that Thursday would not have been "under there for one,

- 11 -

two, or three days[.]" While this evidence may serve to establish that Hodgkins made contact with Lodge at some point before her death, it fails to prove he killed Lodge.

When reduced to its core, the evidence connecting Hodgkins to the murder consists only of proof that his DNA was detected within scrapings collected from Lodge's left fingernails. See Jaramillo, 417 So. 2d at 257 ("Proof that Jaramillo's fingerprints were found on certain items in the murder victims' home was the only evidence offered by the State to show that Jaramillo was involved in these murders."). However, the State presented no direct evidence of how the DNA came about being in its location. See Ballard, 923 So. 2d at 483. Rather, in theorizing that Hodgkins' DNA was transferred when Lodge scratched him during strangulation, during oral arguments the State hesitantly described the sample removed from Lodge's fingernails as being bloody skin cells. This was a mischaracterization of the evidence.

First, whether we assume the supposed skin cells were covered by either Lodge's blood or Hodgkins' blood, nothing in the record indicates that any blood was detected on the sample collected from Lodge's left fingernails. More to this point, the State presented no evidence showing that Hodgkins' blood was found anywhere on Lodge's body or in her apartment. Secondly, the State's expert witness described the DNA itself as being "robust," meaning there was "a

considerable amount of DNA present that [was] completely intact" and not significantly degraded for purposes of developing a complete profile. In other words, it was "high-level DNA." The expert further agreed that the actual sample collected from Lodge's left fingernails was not "a big chunk of skin[.]" Rather, it was visible pieces of "material[] that look[ed] consistent with something scraped out from under [one's] fingernails." Interpreting this description in a light favorable to the State, this evidence does not show that the sample in which Hodgkins' DNA was embedded was anything more than scrapings of dirt, oil or other debris that naturally accumulates under the nail. And, as expounded upon below, the record evidence equally generates the theory that Hodgkins' DNA was transferred to Lodge through innocent contact.

In addition, similarly to Ballard, the record shows that eighteen unidentified fingerprints were lifted from the crime scene, but none belonged to Hodgkins. See id. at 484 ("[W]hile there was one hair identified as Ballard's from Jones' hand, there were other hairs not traced to Ballard on the hand, and literally hundreds of other unidentified hairs at the scene that were never DNA-tested."). The State's medical expert also testified that, of her thirty-two bodily injuries, Lodge had abrasions on her face that were consistent with blunt trauma from a fist or bottle. The record reflects that a beer bottle bearing her blood was recovered from the crime scene. Viewing this evidence favorably to the State, we find that the

- 13 -

assailant likely used, at least, that beer bottle to beat Lodge's face. But, the State presented no direct evidence of Hodgkins' fingerprints being on the bottle or, much less, that any additional measures were taken to establish a link between the bottle and whomever used it as a weapon. In fact, there is no evidence in this record that the murder weapon was recovered. See id. at 485 ("The murder weapon was never discovered, and, although the curl bar and weight found at the scene had bloody fingerprints, none of them were identified as Ballard's.").

Also like Ballard, no eyewitnesses placed Hodgkins in or around Lodge's apartment at the time of the murder. Other than lying about the last time he and Lodge engaged in sexual intercourse and stating that he did not want his wife to learn about his infidelity, Hodgkins made no admissions concerning the murder. Likewise, the only indication in this record concerning Hodgkins' interest in killing Lodge includes the interrogating detectives' repeated insistence that Hodgkins became upset when Lodge finally decided not to comply with his sexual advances. We have not encountered any evidence in the record concerning, for instance, Hodgkins' animosity towards Lodge to substantiate this theory. Although direct testimony shows that, on the evening of Monday, September 27, Lodge appeared aggravated after conversing with Hodgkins at her apartment door for five minutes, no evidence was introduced corroborating the substance of the conversation or confirming that the conversation later incited Hodgkins to kill

Lodge.  And, we refuse to surmise that Lodge's manifested demeanor somehow denotes Hodgkins' criminal intent towards her.  See id. at 482 (reiterating that "the circumstantial evidence test guards against basing a conviction on impermissibly stacked inferences" (quoting Miller v. State, 770 So. 2d 1144, 1149 (Fla. 2000)) (internal quotation marks omitted).  If anything, it merely demonstrates Lodge's ill feelings towards Hodgkins at that moment—not necessarily the inverse.  Nevertheless, Hodgkins' admissions that he and Lodge used to date in the late eighties, remained friends since then, and were sexually active as recent as the Monday[5] before the murder belies the notion that Hodgkins harbored any hatred towards Lodge.  See id. at 484-85.

This is not a case like Washington v. State, 653 So. 2d 362 (Fla. 1994), where the first-degree murder conviction was supported by not only forensic evidence from the crime scene, but also evidence of the defendant's possession and selling of the victim's belongings after the murder, and records establishing his proximity to the crime scene around the time of the murder.  Id. at 366.  Nor are the circumstances here reminiscent of Thorp, 777 So. 2d at 390, where, in addition to DNA evidence, the State introduced direct evidence linking the defendant to the

---

5. During his second interview with PCSO, Hodgkins indicated that he last had sex with Lodge "three days before her death."  While this timeframe is unclear from the record, viewing the evidence in a light favorable to the State, it appears Hodgkins meant he engaged in sexual intercourse with Lodge sometime on Monday, September 25, 2006.

first-degree murder of a prostitute in a park, including the defendant's admissions to his cellmate, and observations from the night in question of blood on his clothing and injuries consistent with a physical struggle. In this circumstantial case, the State simply has not pointed to legally sufficient evidence establishing a nexus between Hodgkins' DNA and any criminal conduct on his part.

Furthermore, we find that the State's evidence is wholly consistent with Hodgkins' hypothesis of innocence that someone else killed Lodge. Preliminarily, we conclude that the timeframe within which Lodge could have been killed was far too lengthy to reasonably infer that only Hodgkins made contact with Lodge. The record reflects that Lodge worked at Frank's Café the morning of Wednesday, September 27, but left around 10 a.m. to attend a doctor's appointment. The State presented testimony and phone records showing that she called the restaurant that day at 2:23 p.m.—which establishes she was still alive. However, the State did not introduce any other evidence concerning Lodge's activity following the phone call. Nor was there any evidence of Hodgkins' activity or whereabouts that day. Additionally, Leslie Thomas, Lodge's coworker, testified that she attempted to pick up Lodge for work on Thursday, September 28. Thomas testified that Lodge did not answer her 5:30 a.m. phone call or respond when she knocked on the apartment door and bathroom and bedroom windows fifteen minutes later. Thomas recalled that the front door was locked, but that both the light and

television in the bedroom were on. PSCO Sergent Larry Engle testified that when he arrived at the apartment at 1 p.m. that afternoon, Lodge was dead and her head was lying in a pool of dried blood. The fact that the blood was dry, Engle explained, indicated that the murder did not occur immediately before he found Lodge.

These circumstances evince that Lodge was murdered between approximately 2:30 p.m. that Wednesday and 5:30 a.m. the following day—a fifteen-hour window. Cf. Washington, 653 So. 2d at 363, 366 (evidence introduced in support of first-degree murder conviction established that victim was killed in her home within a four-hour window, and that defendant was imprisoned at a work release center about two miles from victim's home but, on the day of the murder, was absent from the center for over three continuous hours within that four-hour window).

Next, the State highlights its expert witness's testimony for support that Hodgkins was the last person to make contact with Lodge, and that such contact was contemporaneous with the murder. Crime laboratory analyst Lisa Thoomas testified that in the DNA mixture collected from Lodge's left fingernail scrapings, she detected no foreign profile other than that consistent with Hodgkins'. She acknowledged that "one explanation" for this finding was that Hodgkins was the

last person to come into contact with Lodge before she died.  However, she could not definitively rule out other explanations for this finding.

Moreover, Thoomas testified that a complete profile could not be created from foreign DNA found on Lodge's left fingernail clippings, but that a male indicator was detected.  Thoomas agreed on cross-examination that cellular material could transfer from one person to another's fingernails through constant, everyday contact, such as hand-shaking or sexual intercourse.  Based on Hodgkins' recorded interviews, he and Lodge always hugged and kissed before departing from encounters with one another.  Particularly while hugging, Lodge would put her hands under Hodgkins' shirt and lightly rake his back with her fingernails.  According to Hodgkins, on several occasions before the day of the murder, the two engaged in consensual intercourse in Lodge's apartment.  Finally, as previously discussed, the State presented no evidence showing that Hodgkins left any of the eighteen unidentified fingerprints, or that his fingerprints were on the beer bottle with which Lodge likely was beaten.

This evidence leaves unrefuted the possibility that Hodgkins was merely one of the last persons to make contact with Lodge but the only one to leave detectable forensic evidence.  In other words, the State's evidence is equally susceptible to the theory that, after Hodgkins made innocent contact with Lodge, the perpetrator then killed her but left either no detectable forensic evidence or no evidence at all at the

- 18 -

crime scene.  This is true regardless of whether Hodgkins encountered Lodge at her apartment or out in public, and likewise whether they embraced each other with a friendly hug or engaged in sexual intercourse.  See Jaramillo, 417 So. 2d at 257 ("The State failed to establish that Jaramillo's fingerprints could only have been placed on the items at the time the murder was committed."); see also Miller v. State, 107 So. 3d 498, 501-02 (Fla. 2d DCA 2013) ("Th[e] [State's] theory, however, ignores the State's own evidence that someone could have touched the gun after the 'major contributor' and simply left no detectable DNA.  Moreover, the State's expert clearly testified that there was no way to determine from the mere presence of DNA on the gun when it was deposited.").

This theory is bolstered by evidence that: (1) a spare key to Lodge's apartment that was hidden outside was missing on the day of the murder and has yet to be recovered; (2) there were no signs of forced entry in the apartment; (3) Lodge lived directly across the street from Frank's Café and several coworkers had been inside her apartment on numerous occasions; (4) Lodge sometimes hosted parties and cookouts at her apartment; (5) she dealt drugs to various people out of her apartment; and (6) her drug dealer and ex-husband used to beat her.  We find this evidence to be consistent with the possibility that anyone who knew the hidden location of the spare key could have used it to gain access to Lodge's apartment and kill her.  In fact, the evidence, and especially the lack of forced entry into the

- 19 -

apartment, generates the theory that the unidentified assailant was invited into the apartment with Lodge's consent, killed her, and then locked the apartment on the way out using the spare key.

## CONCLUSION

In this purely circumstantial case, we must determine not only whether the State has proven the "elements of the crime beyond a reasonable doubt," but also whether the record contains "competent evidence which is inconsistent with the defendant's theory of events." Johnston, 863 So. 2d at 283 (quoting Darling, 808 So. 2d at 156). The analysis set forth above compels us to find that the State has failed to meet these burdens. We, therefore, conclude that the evidence before us is insufficient to sustain Derral Hodgkins' first-degree murder conviction. Accordingly, we reverse and vacate the conviction and sentence of death, and remand with directions that a judgment of acquittal be entered.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, and PERRY, JJ., concur.
LABARGA, C.J., concurs with an opinion, in which PARIENTE, J., concurs.
CANADY, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

LABARGA, C.J., concurring.

I concur that reversal is proper in this case, but write separately to remind trial judges of the proper standard for shackling a defendant during trial. A judge generally has the discretion to determine when, for the security and safety of those in the courtroom, a defendant should be in physical restraints during trial. See Smith v. State, 7 So. 3d 473, 493 (Fla. 2009). However, putting a defendant in physical restraints, such as shackles or waist restraints, during a criminal trial is inherently prejudicial because visible, physical restraints interfere with the defendant's presumption of innocence and the fairness of the fact-finding process. Knight v. State, 76 So. 3d 879, 886 (Fla. 2011).

Related concerns arise when a defendant is shackled during the penalty phase when the jury is deciding whether to recommend a sentence of life or death. Deck v. Missouri, 544 U.S. 622, 632 (2005). This decision is no less important than guilt given the severity and finality of the punishment. Id. For these important reasons, restraints must only be used "when 'justified by an essential state interest' specific to the defendant on trial." Knight, 76 So. 3d at 886 (quoting Deck, 544 U.S. at 624). However, the right to be free from restraints can be overcome by a showing of necessity because of physical security, escape prevention, or courtroom decorum. Hernandez v. State, 4 So. 3d 642, 656 (Fla. 2009). Therefore, the analysis is unique to each defendant according to the circumstances.

The law is clear that a court cannot place a defendant into visible, physical restraints merely as a routine matter. Id. at 658. Inquiry into the reasons behind the restraining of a defendant is essential even in the penalty phase where "it may be that a lesser showing of necessity is required to permit the shackling of the defendant." Bello v. State, 547 So. 2d 914, 918 (Fla. 1989) ("In this case, although defense counsel objected to the shackling and requested that an inquiry be made, the trial judge refused to do so, deferring to the sheriff's apparent judgment that such restraint was necessary without inquiring into the reasons behind that decision."). This Court has repeatedly held that if counsel timely objects and requests an inquiry into the necessity of the restraints, the court must conduct a hearing on the matter. See Hernandez, 4 So. 3d at 657; Bryant v. State, 785 So. 2d 422, 429 (Fla. 2001); Bello, 547 So. 2d at 918. The trial court must review the circumstances surrounding the case and the particular defendant and determine, on the record, whether the restraints are necessary for that particular defendant. The trial court should consider a number of circumstances, including but not limited to a defendant's prison records, testimony of witnesses, testimony of correctional and law enforcement officials, a defendant's threats of harm or escape, and a defendant's conduct during the instant case proceedings. See Bryant, 785 So. 2d at 429-30; Bello, 547 So. 2d at 918.

That inquiry did not occur in this case. Before the penalty phase began, the trial judge ordered Hodgkins to remain in the "lockbox" with handcuffs, a waist chain, and leg irons. Counsel timely objected to the restraining of Hodgkins, and particularly objected to the lockbox, stating that Hodgkins had behaved appropriately in the proceedings and that there was no likelihood of disruption. The judge explained that his deputy, under the direction of the Sheriff's Office of Pasco County, had a standard security protocol of shackling defendants. The judge also noted that the jail viewed Hodgkins as a suicide and escape risk, which was considered normal procedure after a conviction in a capital case, and that it was alleged that Hodgkins had a prior serious violent felony. Therefore, the judge deferred to the jail's security protocol even though the judge said Hodgkins exemplified past good behavior and conducted himself like a gentleman in the proceedings. It appears that the judge felt obligated to follow the deputy's security protocol when he said, "I'm not going to direct the jail to violate their security protocols" and "I wish . . . I could take the lockbox off [Hodgkins], but I cannot." While a deputy's job in the courtroom to protect the safety and well-being of the people in attendance is an important one, the policy of the sheriff's office is not determinative of the matter.

PARIENTE, J., concurs.

CANADY, J., dissenting.

Because I disagree with the Court's conclusion that there is insufficient evidence to support the jury's verdict of guilt in this case, I respectfully dissent. While the verdict of guilt rests on circumstantial evidence, the permissible inferences from the evidence are sufficient for a rational trier of fact to conclude that the State proved Appellant's guilt beyond a reasonable doubt. As we have said many times, whether the evidence "exclude[s] all reasonable hypotheses of innocence is for the jury to determine." State v. Law, 559 So. 2d 187, 188 (Fla. 1989). The majority has in effect reweighed the evidence and substituted its judgment on the weight of the evidence for that of the jury.

The associate medical examiner testified that the immediate cause of death was "sharp force injury." The victim suffered a stab wound that severed her aorta and another that severed her jugular vein. There were bruises on the victim's neck showing she was also strangled manually. There were no defensive knife wounds. These findings supported the conclusion that the manual strangulation was inflicted first, rendering the victim unconscious, and then the fatal stab wounds were inflicted. The autopsy showed that the victim suffered a fractured hyoid bone and there was petechial and subconjunctive hemorrhaging in the eyes. These findings, in the pathologist's opinion, indicated that the victim was conscious and struggled against the attack before losing consciousness due to oxygen deprivation.

- 24 -

Material was scraped from under the fingernails of the murder victim, Teresa Lodge. Upon examination, some of the material from under the fingernails on Lodge's left hand was found to be human tissue containing DNA. Whether the material was skin, blood, or some other human tissue is immaterial. Any DNA found there that was not her own had to have come from someone else. A forensic pathologist testified that normal activities such as bathing and washing can remove foreign DNA from the body and that DNA is subject to degradation from contact with moisture, bacteria, chemicals, and other material in the environment. When DNA is present but degraded, it provides a less than complete profile. The material removed from under the fingernails of the decedent's left hand was described as "robust," by which the examiner meant that it was not degraded and it provided an intact length of DNA that could be examined on all thirteen loci. The DNA material obtained from the body of Teresa Lodge matched Appellant's DNA on all thirteen loci.

Teresa Lodge worked as a restaurant manager and cook. Several employees of the restaurant—including some who had worked with her for years—testified that Lodge was very conscientious about keeping the cooking implements and food preparation surfaces clean. Her routine included washing pots and pans by hand throughout the day. There were three sinks for washing pots and pans by hand. First Lodge would scrub the pots and pans in very hot water and detergent, making

sure to scrape off any adhered bits of food. Then they were submerged in a second sink filled with hot water containing a sanitizing solution. Finally they were rinsed in a third sink filled with clean hot water. Each step required submerging the pot or pan completely. The witnesses also testified that Lodge cleaned the grill and other work surfaces numerous times throughout the work day using a sanitizing cleanser and washed her hands repeatedly throughout the day. She never wore rubber gloves when performing these kitchen cleaning tasks.

Lodge worked at the restaurant on Monday, Tuesday, and Wednesday, September 25-27, 2006. On Wednesday, she trained a new kitchen employee. The employee testified that Lodge trained her in the food-handling and kitchen hygiene requirements of the restaurant. The new employee testified that Lodge demonstrated the use of the three sinks for washing and sanitizing pots and pans and showed her how to clean the cooking and work surfaces in the kitchen. These tasks were to be done repeatedly throughout the day. And most importantly, Lodge trained her new employee in the importance of hand washing, which was required before and after touching any raw or cooked food product, to avoid "cross-contamination," and after performing any washing or cleaning task. There was a separate sink in the kitchen for hand washing. Hand washing was done with soap and hot water. Lodge trained the new employee to wash between the fingers,

to scrub under the fingernails, and to wash all the way up to the elbows. Lodge washed her hands repeatedly that Wednesday morning using these methods.

On the morning of Wednesday, September 27, Lodge not only trained the new employee in these cleaning methods, but demonstrated them because there were several pans in which prepared food had been refrigerated overnight. The pans were to be used with a steam table for serving soups, chili, and gravy. The food from the day before had to be removed and the pans cleaned. Some of the pans had food stuck to them that had to be scrubbed off using hot water and detergent. That morning, Lodge and her new assistant cooked bacon, sausage, potatoes, grits, biscuits, and eggs, cleaning their work surfaces and implements as they worked. Lodge cleaned the inside of the microwave. When a surface had adhered food or debris not accessible to a scraping or scrubbing tool, Lodge scraped the material off with her fingernails. Of course, after any such task, she washed her hands. Later that morning, Lodge left the restaurant for a doctor's appointment. Although she was expected to return to the restaurant that day, she did not. She did not show up for work on Thursday, the day her body was found. As the majority opinion states, Lodge was probably killed some time between 2:30 p.m. on Wednesday and 5:30 a.m. Thursday.

When detectives first interviewed Hodgkins, he admitted that he knew Lodge, claimed to have dated her in the mid-1980s, and said he had only seen her a

few times since then.  He said that the last time he had seen her was about six to eight weeks before the murder, when she greeted him at a Circle K convenience store/gas station with a friendly hug.  Other than seeing her briefly a few times at the restaurant where she worked, he said the only other times he had seen her were in 2004, when he stopped by to see her, accompanied by his adult son, and found she was staying in a different apartment than previously because her apartment had been damaged by a water leak.  He saw her again in late 2004, he said, when she was back in her original apartment, but he did not go inside.  He visited her out in front of the building.  He denied ever entering the apartment where Lodge was living at the time of her death.  He claimed their relationship was always friendly.

When detectives interviewed Hodgkins a second time, they confronted him with information they had obtained from the apartment complex manager that the water damage repairs to Lodge's apartment were done in the summer of 2006, not in 2004.  Hodgkins responded that he might have been mistaken about the dates.  When the detectives told him his DNA had been found under Lodge's fingernails, he told them that when he saw her at the Circle K and she hugged him, she put her hand up the back of his shirt and scratched his back.  After the detectives suggested that casual contact like that would not cause a transfer of DNA, Hodgkins admitted that he had seen Lodge a month to a month and a half before her death, they had sex, and she scratched his back hard enough that he felt stinging later when he

showered. He admitted that he had seen her both at the other apartment where she was staying temporarily and at the apartment where she was living at the time of her death and that these visits were in the months preceding her death, not in 2004. When the detectives told him the DNA would not remain on her hands that long because of her habit of keeping her hands clean, he finally stated that he had sex with her "three days prior to her being killed" and that she scratched his back "real hard." Hodgkins told the officers he had learned of Lodge's death on the television news. The body was discovered on September 28. As the majority opinion indicates, presumably he meant their last contact was on or about Monday, September 25. When the detectives asked Hodgkins why he had lied, he said he did not want his wife to find out about his having sex with Lodge and because he was afraid he would be suspected of the murder.

Melanie Zakel testified that she visited Lodge the night of Monday, September 25. Some time after midnight, there was a knock at the door. Lodge opened the door, and from the tone of her voice in speaking to the person at the door, Zakel detected "a little bit of uneasiness," so she moved to where she could see who was at the door. She identified Hodgkins as the person she saw at Lodge's front door. Hodgkins looked at Zakel and seemed displeased that she was there. Lodge did not invite him in, and after he left it seemed to Zakel that Lodge "was a little bit aggravated" by the visit. Except for the identification of Hodgkins,

Zakel's testimony about this incident was based on her perceptions of tone of voice and facial expressions. The credibility and weight of this evidence was for the jury to determine. If the jurors believed it, they could have found it was in conflict with Hodgkins' claim that he and Lodge were on friendly terms and had consensual sex at her apartment on or around that day as he claimed in his final statement. This inference from the evidence is inconsistent with the factual claim in Hodgkins' final statement and provides a basis for the jury to reject his hypothesis of innocence.

As we stated in Law, "[t]he state is not required to 'rebut conclusively every possible variation' of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events." 559 So. 2d at 189 (footnote omitted) (quoting State v. Allen, 335 So. 2d 823, 826 (Fla. 1976)). The theory of events asserted by Appellant, based on his final statement to the police, is that his DNA was found on the victim's body because of their interaction three days before her death and that he lied to the police about how recently and how frequently he had seen the victim because he did not want his wife to find out and was afraid he would be accused of the murder. However, if Hodgkins had told the officers his final story when they first questioned him, there is no reason his wife would have found out. He also clarified that he was not married at the time of the murder and had only been

married a few weeks when the police first questioned him, which was over a year after the murder. It is still plausible that he did not want his wife to find out, but the import of this information and its weight were for the jury to determine.

A jury is permitted to draw reasonable inferences from the evidence. See, e.g., Walker v. State, 957 So. 2d 560, 578 (Fla. 2007). False statements to the police can be material evidence because of what they tell the jury about a defendant's state of mind when making the statements. See, e.g., United States v. Holbert, 578 F.2d 128, 129 (5th Cir. 1978) ("[A] long line of authority . . . recognizes that false exculpatory statements may be used . . . as substantive evidence tending to prove guilt."); Simpson v. State, 562 So. 2d 742, 745 (Fla. 1st DCA 1990) (observing that a defendant's false statement "would have been admissible in the State's case as substantive evidence tending to affirmatively show a consciousness of guilt"), review denied, 574 So. 2d 143 (Fla. 1990). The way Appellant's story changed in response to the detectives' statements to him is a circumstance the jury could properly take into consideration in weighing the evidence. Appellant's final statement to the police is the source for his theory or hypothesis of innocence, and the inconsistencies in his statements are a valid basis for the jury to discount the credibility of that final statement. See Orme v. State, 677 So. 2d 258, 262 (Fla. 1996).

The majority opinion notes that Hodgkins' fingerprints were not found in the victim's apartment, even though eighteen prints were lifted and not identified. The absence of his fingerprints does not detract from the evidentiary basis for the jury's verdict, since a perpetrator can take steps to avoid leaving prints. There was testimony that Lodge's friends and coworkers frequently visited her apartment, so it is not surprising that there were a variety of unidentified prints. If Hodgkins had recently visited the apartment with Lodge's consent as he claimed, it would be surprising for his prints not to be found there. This too is a factual circumstance the jury could have considered.

The majority opinion refers to the cross-examination of the State's DNA expert, in which she conceded the validity of an article published in a scientific journal. The article described a study in which test subjects self-reported their routine daily activities over a forty-eight-hour period and then their fingernails were tested for the presence of DNA. The study concluded that DNA can be transferred through a variety of activities, including interpersonal relations ranging from casual to intimate contact, and can remain despite washing and bathing. The fact that DNA can be transferred by ordinary daily activities and can remain under the fingernails for days despite routine hand-washing does not compel the conclusion that Hodgkins' DNA could remain under Lodge's fingernails for three days despite her extraordinary activities. This was a matter for the jury, and the

jury could have concluded that the intensity and frequency of Lodge's hand-washing and dishwashing activities and the evidence that she engaged in these activities for three days before she died made her situation different from the routine hand-washing discussed in the article. In any event, if foreign DNA is so easily transferred through casual contact and can remain for days despite frequent hand-washing, the jury might have expected to find other DNA under Lodge's fingernails, not just Hodgkins' and Lodge's.

For three days before she died, including the morning of the day she was last heard from by coworkers, Teresa Lodge washed pots and pans in detergent and hot water, submerged them in more hot water and sanitizing solution, and rinsed them in hot water. She cleaned a grill and work surfaces with hot water and a sanitizing solution. She handled raw food, and she washed her hands repeatedly throughout the day. She was known for washing her hands thoroughly before and after handing food and after performing a cleaning task and was seen doing so repeatedly that morning. The expert testimony that contact with moisture, chemicals, or bacteria degrades the condition of DNA and that the DNA sample collected from the body was intact, combined with testimony that Lodge engaged in the work routines described above for the three days immediately before her death, would justify a jury's conclusion that the DNA under her fingernails was deposited there after the last morning she worked at the restaurant and not three

days before as posited by the defense hypothesis of innocence. This evidence was sufficient to rebut the theory that, as Appellant claimed in his final statement to police, his last interaction with Lodge was three days before her death and involved scratching during sex, because it was reasonable for the jury to conclude it was highly unlikely that an intact, "robust" amount of his DNA would have remained under her fingernails for that period of time under the circumstances.

Teresa Lodge was left-handed. It was reasonable for the jury to infer that she would have used her left hand to try to defend herself. The biological material from which an intact sample of DNA was obtained was scraped from under the fingernails of her left hand. The jury could reasonably conclude that the biological material found under her fingernails after her death was deposited there when she struggled against the attack that ended her life. In light of the evidence that Lodge was conscious when her attacker began to strangle her, it was reasonable for the jury to infer that DNA from Hodgkins' body got under her fingernails when she tried to fend off the attack. It was reasonable for the jury to conclude that the person she scratched was the one who strangled her into unconsciousness and then stabbed her. The reasonable conclusion is that Appellant was with her at the time of her death and he was her killer.

The nature of the acts that caused Teresa Lodge's death were a sufficient basis for the jury to find that the murder was premeditated.

I find that Appellant's other claims on appeal are without merit and would affirm the conviction of first-degree murder. I also would uphold the trial court's sentencing findings and the sentence of death, which is proportional to the offense in light of all the circumstances.

An Appeal from the Circuit Court in and for Pasco County,
Pat Edward Siracusa, Jr., Judge - Case No. 512007CF006351A000ES

Howard L. Dimmig, II, Public Defender, and Matthew David Bernstein, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Sara Elizabeth Macks, Assistant Attorney General, Tampa, Florida,

for Appellee